# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH B. GORINI, | : | CIVIL ACTION NO. 1:CV 99-2215 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE YVETTE KANE |
| | : | |
| AMP INCORPORATED or its Successor | : | |
| In Interest, TYCO ELECTRONICS | : | |
| CORPORATION, | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

## TYCO ELECTRONICS CORPORATION'S REPLY TO PLAINTIFF'S
## BRIEF IN OPPOSITION TO TYCO'S MOTION FOR SUMMARY JUDGMENT



FILED

FEB 2 5 2002

PER_____
HARRISBURG, PA  DEPUTY CLERK

VINCENT CANDIELLO
G. SCOTT PATERNO
One Commerce Square
417 Walnut Street
Harrisburg, PA  17101-1904
717 237-4000

Of Counsel:

    MORGAN, LEWIS & BOCKIUS LLP

Dated:  February 25, 2002

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

I.      INTRODUCTION ..................................................................................................2

II.     ARGUMENT...........................................................................................................2

        A.      TYCO is Entitled to Summary Judgment on All of Plaintiff's Claims.. .......2

        B.      TYCO is Entitled to Summary Judgment on Plaintiff's Claims for
                Additional Severance Benefits under Either Plan .........................................3

                1.      Plaintiff was not offered a benefit under the 1991 Plan.....................3

                2.      Plaintiff was a Tier 3 Employee under the 1998 Plan ......................7

        C.      TYCO is Entitled to Summary Judgment on Plaintiff's ERISA Disclosure
                Claims ...........................................................................................................11

        D.      TYCO is Entitled to Summary Judgment on Plaintiff's WARN Claims ......14

        E.      TYCO is Entitled to Summary Judgment on Plaintiff's Breach of Contract
                Claim  ...........................................................................................................15

        F.      TYCO is Entitled to Summary Judgment on its Counterclaims...................16

                1.      Erroneous payment .........................................................................16

                2.      Over-payment ..................................................................................17

III.    CONCLUSION......................................................................................................17

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) ...........................................12

*Jackson v. E.J. Branch*, 937 F. Supp. 735 (N.D. Ill. 1996) ...............................13

*Johnson v. Telespectrum Worldwide, Inc.*, 2002 WL 54693 (3d Cir. 2002) ....................15

*Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 585-587 (1986) ..........................................................................................5, 7

*Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995) ..........................................................10

*Pocellini v. Strassheim Printing Co., Inc.*, 578 F. Supp. 605, 613, 614 (E.D. Pa. 1983) .14

*In Re Unysis Corp.*, 58 F.3d 896, 905-906 (3d Cir. 1995) ...................................................9

## STATE CASES

*Fidelity Bank v. Tiernan*, 375 A.2d 1320 (Pa. Super. 1977) ...............................................16

*Hartzfeld v. Snyder Township School District*, 170 A.2d 355 (Pa. 1961) ........................16

*Rutherford v. Presbyterian-University Hospital*, 417 Pa. Super. 316 (1992) ...................15

*Stumpp v. Stroudsburg Municipal Authority*, 658 A.2d 333 (Pa. 1995) ...........................15

## FEDERAL STATUTES

29 C.F.R. §§ 2520.104a-5(a)(2) and 2611.3(c) .............................................................13

29 U.S.C. § 626(f) ................................................................................................................6

29 U.S.C. § 1002(7) ............................................................................................................12

29 U.S.C.A. § 1024(a)(1)(A) ..............................................................................................13

TYCO Electronics Corporation ("TYCO"), by and through its attorneys, files its Reply Memorandum of Law to Plaintiff's Brief in Opposition to TYCO's Motion for Summary Judgement.

## I.   **INTRODUCTION**

On February 5, 2002, both Plaintiff and TYCO filed memoranda of law in opposition to the other's motion for summary judgment. The exchange of memoranda demonstrates that the issues in the case revolve around a few, distinct issues: 1) whether Plaintiff was offered a benefit under the 1991 Plan; 2) whether Plaintiff was appropriately categorized as a Tier 3 employee under the 1998 Plan; 3) whether TYCO provided all required documents under ERISA; 4) whether TYCO fully compensated Plaintiff for all accrued and unused vacation time consistent with its policy; and 5) whether TYCO is entitled to judgment on its counterclaims.

## II.   **ARGUMENT**

### A.   **TYCO Is Entitled To Summary Judgment On All of Plaintiff's Claims**

In its motion for Summary Judgment, TYCO raised the argument that it is entitled to summary judgment on all of Plaintiff's claims because of his acceptance and retention of funds contingent upon his execution of a release of all claims against TYCO. Plaintiff never responds to this argument in any brief relative to either motion. TYCO reasserts the unrebutted arguments raised in its Brief in Support of its Motion for Summary Judgment.

**B.   TYCO Is Entitled To Summary Judgment On Plaintiff's Claims For Additional Severance Benefits Under Either Plan.**

    **1.   Plaintiff was not offered a benefit under the 1991 Plan.**

From the commencement of this action through discovery, TYCO consistently maintained, and provided evidence to support, that it never offered Plaintiff a benefit under the 1991 Plan.  In fact, TYCO demonstrated that it offered no one a benefit in the 1999 reduction in force a benefit under the 1991 plan.  The 1991 Plan unambiguously provides TYCO with sole and absolute discretion to determine whether to offer a benefit at all, a fact that Plaintiff concedes.  (Plaintiff's Brief in Support of His Motion for Summary Judgment ("Pl. Supp. Brief at __") at 6.

Undeterred, Plaintiff asserts TYCO offered him a benefit under the 1991 Plan because of the existence of the phrase "enhanced severance" in TYCO's offer of additional severance benefits, a term that appears in the 1999 amendment to the 1991 Plan.  As demonstrated below, Plaintiff's argument cannot be sustained.

As an initial matter, it is important to note that the term "enhanced severance" is not a term of art with a specific meaning in ERISA or trust law.  The text in question provided:

> You will receive 2 months of severance pay in the amount of $19,355 in accordance with the AMP Incorporated Employee Severance Plan [the 1998 Plan].  The severance amount will be paid within 5 business days of your termination date.  Additionally, in consideration for signing the enclosed Release and Related Agreements (Release), you will receive an additional lump sum severance in the amount of $19,355 and extended medical, dental, and vision insurance as described below.  This enhanced severance amount will also be paid in a lump sum as soon as practicable following your termination date.

Compl., Ex. E.  As the text demonstrates, the term "enhanced severance" related specifically to the benefits outlined in the previous sentence.

Without any semblance of a factual reference to the 1991 Plan, Plaintiff argues this phrase somehow and in some manner represents an offer of benefits under the 1991 Plan.  But this argument is nonsensical.  Plaintiff's argument ignores that TYCO clearly identified the 1998 plan in the first sentence, yet did not identify the 1991 plan when offering enhanced severance.  Plaintiff offers no evidence or explanation for TYCO's failure to provide this linkage when it did so specifically did so in reference to the 1998 Plan.  He points to no other person receiving a benefit under the 1991 Plan on the basis of this logic.  He identifies no instance in which TYCO made such a link by reference to this generic language.

The unrebutted evidence in this case demonstrates consistently that TYCO elected not to utilize the 1991 plan for the 1999 reduction in force.  Mr. Cain's testimony illustrates this fact:

> Q:     Who are participants in the 1991 Severance plan in 1999?
>
> A:     In 1999 there were no participants.
>
> Q:     There were no participants, there was nobody who could have been covered underneath that plan?
>
> A:     There was nobody that received benefits under that program.

TYCO's Counter Statement of Facts, at ¶ 7.  Mr. Booker also testified that TYCO did not offer any employee a benefit under the 1991 Plan in connection with the 1999 reduction in force.  TYCO's Statement of Undisputed Material Facts ("Facts, at ¶ __") at ¶ 32.  Brian Cain concurred, noting that Plaintiff was not offered a benefit under the 1991 Plan,

as "benefits [for any TYCO employees] had not been initiated pursuant to that plan."
TYCO's Counter Statement of Facts at ¶ 5.

The only "evidence" upon which Plaintiff relies is his argument regarding
the meaning of the phrase "enhanced severance" in his severance letter. He never
explains why that phrase is nothing more than a reference back to the antecedent
sentence. However, arguments are not evidence. This argument does not create a
genuine issue of material fact. The Supreme Court, in <u>Matsushita Electrical Industrial
Co., Ltd. v. Zenith Radio Corporation</u>, 475 U.S. 574 (1986), held that "to survive
[defendant's] motion for summary judgment, [Plaintiff] must establish that there is a
genuine issue of material fact . . ." <u>Matsushita</u>, 475 U.S. at 585-586. The Supreme Court
stressed that "the issue of fact must be genuine," holding that:

> When the moving party has carried its burden under Rule
> 56(c), its opponent must do more than simply show that
> there is some metaphysical doubt as to the material facts.
> In the language of the Rule, the nonmoving party must
> come forward with "specific facts showing that there is a
> genuine issue for trial." Where the record taken as a whole
> could not lead a rational trier of fact to find for the non-
> moving party, there is no "genuine issue for trial."

<u>Id</u>., at 586-587 (internal citations omitted) (emphasis in original). Thus, in order to
survive summary judgment Plaintiff must point to admissible evidence demonstrating a
genuine issue for trial.. His expansive reading of a plainly worded document read as a
whole and not parsed to achieve a result is insufficient to survive TYCO's motion.

As Plaintiff knows, the enhanced severance to which Plaintiff's second
letter referred was the result of Mr. Booker asking for and receiving permission to offer
certain short-term employees a total of six-months' salary continuation. Facts, at ¶ 30.
This salary continuation was broken down into three components: 1) two months' notice

pay until Plaintiff's termination date; 2) two months' severance pay to which Plaintiff

was entitled under the 1998 Plan as a Tier 3 participant; and 3) an additional two months'

pay as consideration for executing a release of claims outside of any plan document.

Facts, at ¶ 30. Neither Mark Smith's nor Mr. Booker's testimony identify this "enhanced

severance" originating in any plan much less the 1991 Plan.

Mr. Smith's testimony identified that the enhanced severance was put

together as "a supplement that would help ease the process totally voluntarily, **totally**

**without legal obligation**, totally in an effort to be fair to our employees." Facts, at ¶ 30

(emphasis added). Mr. Smith also noted that Mr. Booker and the HR department "put

together a supplemental policy, **not formal, not written down anywhere other than in**

**the individual letter you received** announcing that you were entitled to a benefit based

on satisfying the conditions of the letter. And there's no connection to the 1991 Plan."

Facts, at ¶ 30 (emphasis added).

Furthermore, TYCO's offer of an additional benefit in exchange for a

release is consistent with the Older Workers Benefit Protection Act, which requires that,

in exchange for a release of claims, employers must offer employees an additional sum in

addition to any severance to which the employer is otherwise entitled. 29 U.S.C. §

626(f). Plaintiff's claim that the additional benefit could only originate under the 1991

Plan ignores that federal law requires consideration separate from any benefit to which an

employee is otherwise entitled in exchange for a release of claims. Id.

At best, Plaintiff can only point to "metaphysical doubt" about TYCO's

decision not to offer benefits under the 1991 Plan, built solely on his argument which

cannot be sustained under any reasonable interpretation.  See Matsushita, 475 U.S. at
586.

### 2.    Plaintiff was a Tier 3 Employee under the 1998 Plan.

Previously, TYCO established that Plaintiff was a Tier 3 employee under
the 1998 Plan.  TYCO offered testimony, notes of meetings, and the criteria used to
determine which employees belonged in each respective Tier.  Facts, at ¶¶ 30-35.

In opposition, Plaintiff asserts he was a Tier 1 participant under the 1998
Plan again by offering a tortured argument built around fragments of testimony.  Plaintiff
begins with Harris Booker's testimony that Tier 1 employees included all "management
designated corporate staff directors."  Pl. Supp. Brief at 9.  Reduced to its most basic
terms, Plaintiff believes that:  1) the term "management designated corporate staff
directors" only appears in the 1991 Plan, so its meaning is found there; 2) because the
1991 Plan does not define the term "management designated corporate staff directors,"
then all directors are included; and 3) because all "management designated corporate staff
directors" are in Tier 1, all Directors, Plaintiff included, are in Tier 1.  What Plaintiff fails
to explain, or even acknowledge, was that there were directors in Tiers 1, 2, and 3.  Facts,
at ¶¶ 31 - 34.

As Mr. Booker's testimony demonstrates, only three specifically named
individuals – Richard Skaare, Jackie Heisse, and Doug Wilburne – were identified as
"management-designated corporate staff directors."  Ex. A, Booker Dep. at 101.  At the
time the 1998 Plan was created, those individuals were identified as "management-
designated corporate staff directors" because "if they walked out the door there would be

a fundamental breakdown in how the company was managing the fight of the change of control." Ex. A, Booker Dep. at 87.

Plaintiff offered no evidence that he fit that description, nor can he point to any evidence that he was ever considered in that group. Therefore, while Plaintiff relies on Mr. Booker's testimony as to the composition of Tier 1, he ignores the remainder of Mr. Booker's testimony regarding each tier. Facts, at ¶¶ 31-35.

The relevant classes of employees under the 1999 Amendment to the 1991 Plan are: "Divisional Officers and management-designated Corporate Staff Directors;" "Band M Level Employees who have been granted stock options;" "Other employees in their Company's Band M or equivalent in a subsidiary organization." Compl., Ex. C. Previously, TYCO demonstrated that Plaintiff was not designated by TYCO to be one of the individuals who was essential to the change in control fight. Rather, Plaintiff was a band M employee who was not granted stock options. Facts, at ¶ 14. Thus, the 1998 Plan excluded Plaintiff from the middle group. What remained was the last group in which TYCO placed Plaintiff, as a manager in Salary Band M, along with all other managers and directors who did not receive stock options. Facts, at ¶¶ 31-35.

Plaintiff advances a two part argument to support his inclusion in the first group: 1) that the phrase "management-designated Corporate Staff Director" included any person management bestowed with the title of director; and 2) that all of these individuals belonged in Tier 1 based on Mr. Booker's testimony. In this, Plaintiff seeks to make much out of the fact that Schedules A and B were not attached to the 1998 Plan.

TYCO admits that Schedules A and B to the 1998 plan never were created, causing an ambiguity. But where an ambiguity exists, "a court may consider,

*inter alia*, the intent of the plan's sponsor, the **reasonable** understanding of the beneficiaries, and past practice in interpreting the plan." In Re Unysis Corp., 58 F.3d 896, 905 n.13 (3d Cir. 1995) (emphasis added).  This three-part analysis requires an examination of the extrinsic evidence of: 1) TYCO's intent; 2) Plaintiff's reasonable understanding of what the 1998 Plan specified; and 3) TYCO's treatment of others in the use of this plan. Unysis, 58 F.3d at 905-906.

　　　　Here, TYCO's intent is evident from the testimony of the individuals charged with the plan's creation.  Facts, at ¶¶ 19-20, 23.  Mr. Booker described the process they utilized to arrive at the employee classifications:

> You had to be a divisional vice president or you had to be one of these three then – these three then identified corporate staff level people [Richard Skaare, Jackie Heisse and Doug Wilburne (TYCO Counter Statement of Facts, at 6)] to be in Tier 1, and to be in Tier 2 you would have to have previously been identified by your management to be a stock option recipient under our stock option plan.  Tier 3 would have been the rest of Band M, and then Tier 4 would have been everybody else who was exempt from the Fair Labor Standards Act.

Booker Dep. at 102 (attached hereto as Ex. A.)  Mr. Booker also noted that, when arriving at these criteria, TYCO considered several documents created contemporaneously with the 1998 Plan.  Ex. A, Booker Dep. at 101.  Mr. Booker also explained how these criteria were applied to Plaintiff:

> My understanding was that [Plaintiff] was a Band M employee, meaning he had a managerial position, but he was not an officer and was not one of the few management designated directors who would get what we were then calling a Tier 1 benefit, and I was also aware as the administrator of the stock option plan that he wasn't in the stock option plan and that, therefore, he wasn't what we were calling a Tier 2 employee, so sort of by default my sense was or is that he should have been a Tier 3 employee.

Facts, at ¶¶ 31-35. Mr. Smith echoed Mr. Booker's comments, and all of the documents produced support the same conclusion: TYCO intended for employees situated as Plaintiff to be treated as a Tier 3 participant. Facts, at ¶ 33-35.

Returning to the analysis, the question then is whether Plaintiff's claimed understanding was reasonable. In order for Plaintiff's understanding to be reasonable, this Court must accept that the proper interpretation of the term "management designated Corporate Staff Director" includes every director at TYCO. But why would a plan sponsor utilize such redundancy in creating the outcome Plaintiff advances. In short, why use the phrase "management designated" at all if it did not have a separate and distinct meaning from how one received the title in the first instance. As Plaintiff argues, one would not be a director unless management designated you to that position. Clearly, TYCO placed these words in its description for some purpose. Basic rules of construction requires that all words in a text be given effect. Restatement (Third) of Trusts Section 4; <u>Moench v. Robertson</u>, 62 F.3d 553, 567 (3d Cir. 1995) (one cannot give an interpretation that renders terms meaningless).

Moreover, Plaintiff never explained the anomaly that other directors were in Tiers 2 and 3. Since it is true that a director level employee could be found in any one of the tiers, then there must be some differentiation between those having the title "director." It would be nonsensical to create three tiers and then have the participants only qualify for the top tier, or give to each such participant the choice to participate in the tier of their choice. In short, Plaintiff never discounts why he is not in Tier 3. Only a stilted reading of the term "management designated Corporate Staff Director" renders the

outcome Plaintiff seeks.  Construction of the tiers taken together with the dispersion of

directors in all groups cannot lead to the absurd result advanced by Plaintiff.

   The final element is TYCO's practice in administering the Plan.  Here, the

practice is limited to TYCO's treatment of other employees involved with the 1999

reduction in force, as it was the only time the 1998 Plan was utilized.  Facts, at ¶ 30-35.

In this context, Plaintiff points to no one else allowed to participate in Tier 1 as a director

level employee who was not essential to the change in control fight.  He points to no

director allowed to participate in Tier 2 that was not also a participant in the stock option

plan.  Thus, TYCO treated Plaintiff consistent with similarly situated employees.  Facts,

at ¶¶ 30-31.

   Under either an arbitrary and capricious or *de novo* standard, TYCO's

actions were rationally based on the intent of the Plan sponsor and consistent with the

Plan's terms.  Plaintiff's tortured definition of a phrase in the 1991 Plan does not boot-

strap him into Tier 1 in the 1998 Plan.  Consequently, TYCO is entitled to summary

judgment.

  **C.**  **TYCO is Entitled to Summary Judgment on Plaintiff's ERISA**
     **Disclosure Claims.**

   Previously, TYCO demonstrated that it provided Plaintiff with all existing

relevant documents within the required 30 days from the date of his first request.  It is

undisputed that Plaintiff requested documents on June 23, 1999, and that TYCO

responded on July 20, 1999.  Facts, at ¶¶ 47-48.

   Plaintiff argues that TYCO's disclosure was not complete.  Plaintiff

claims that he was a participant in the 1991 Plan, entitling him to the summary plan

description, the plan document, and the annual report (Form 5500).  Additionally,

Plaintiff claims that TYCO was affirmatively obligated to inform him that certain documents did not exist.

Plaintiff's argument ignores certain key facts: 1) he was not a participant in the 1991 Plan; 2) the 1998 Plan, while created in 1998, did not become effective until the formal change of control took place on April 2, 1999; and 3) certain of the documents he requested did not exist at the time of his request because ERISA did not require their existence until a later date.. Facts, at ¶ 28.

Plaintiff admits that TYCO had sole and absolute discretion to decide whether to offer a benefit under the 1991 Plan. Pl. Supp. Brief at 6. The relevant testimony and documents demonstrate that TYCO never offered Plaintiff, or any other employee, a benefit under the 1991 Plan. Facts, ¶ 32; Counter Statement of Facts, at ¶ 7. Once the decision was made not to use the 1991 Plan and TYCO terminated him from employment, Plaintiff was excluded permanently from participation in the 1991 Plan.

ERISA defines a "participant" as "any employee or former employee of an employer . . . **who is or may become eligible to receive a benefit of any type from an employee benefit plan** . . ." 29 U.S.C. § 1002(7)(emphasis added); Pl.'s Brief at 5. The United States Supreme Court, in <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), determined that a "former employee who has neither a reasonable expectation of returning to covered employment not a colorable claim to vested benefits, simply does not fit within the [phrase] "may become eligible ." <u>Bruch</u>, 489 U.S. at 117-118 (emphasis added). Under ERISA, Plaintiff was not a participant in the 1991 Plan and, consequently, not entitled to documents relative to the 1991 Plan. Plaintiff claims under the ERISA disclosure requirements relative to the 1991 Plan subsequently must fail. <u>See</u>

*Franchise Tax Board v. Construction Laborers Vacation Trust for So. Cal.*, 463 U.S. 1 (1983) (holding that "ERISA carefully enumerates the parties entitled to seek relief under § 502; it does not provide any one other than participants, beneficiaries, or fiduciaries with an express cause of action").

Plaintiff's claim relative to the 1998 Plan also fails. The 1998 Plan, while created in 1998, did not become effective until the formal change of control from AMP to TYCO took place on April 2, 1999. Facts, at ¶ 28. Thus, 1999 was the first plan year for the 1998 Plan, and, under ERISA regulations, the annual reports were not due to be filed until October 15, 2000. 29 U.S.C.A. § 1024(a)(1)(A); 29 C.F.R. §§ 2520.104a-5(a)(2) and 2611.3(c); Smith Dep. at 160 (attached hereto as Ex. B). Therefore, when Plaintiff made his request for the 1998 Plan documents, the only document that existed responsive to his request was provided. Facts, at ¶ 48. ERISA does not contemplate, and Plaintiff does not offer authority to support, the imposition of liability on TYCO for failure to produce Form 5500 documents that the statute did not require to be created at the time of Plaintiff's request. See *Jackson v. E.J. Branch*, 937 F.Supp. 735 (N.D. Ill. 1996) (imposing a penalty for failure to disclose documents that ERISA required to exist at the time of the request).

In light of the foregoing, Plaintiff's claim for violation of ERISA's reporting and disclosure requirements can be reduced to a claim for damages because Schedules A and B were not attached to the 1998 Plan document. It is undisputed that these documents were never created. Thus, the question becomes even more narrow: should TYCO be liable for failure to create plan documents in order to respond to a request for plan documents?

The purpose of the reporting and disclosure requirements is "to induce or compel compliance with the full disclosure principles which are embodied in ERISA." Pocellini v. Strassheim Printing Co., Inc., 578 F.Supp. 605, 614 (E.D. Pa. 1983). A court in its discretion may impose penalties. Id. at 613. As the Pocellini court held: "If a plan administrator in good faith is unable to comply with a request for information within the thirty (30) day period, the assessment of the statutory penalty would not further the statute's purpose." Id., at 614. Here, TYCO provided Plaintiff with all existing documents. Facts, at ¶ 48. It did not provide Schedules A and B because they did not exist. Facts, at ¶ 25. Under these facts, the imposition of penalties will not further the statute's purpose. Id. TYCO is entitled to summary judgment on this claim.

## D.   TYCO is Entitled to Summary Judgment on Plaintiff's WARN Claims.

Previously, TYCO made clear that Plaintiff did not produce sufficient evidence to satisfy a *prima facie* case under the WARN Act. TYCO Opposition Brief at 17. Second, TYCO demonstrated that it complied with WARN in good faith by attempting to deliver a notice to Plaintiff and others on April 29, 1999, but Plaintiff absented himself from work under unexplained circumstances. TYCO Support Brief at 13-14. Finally, TYCO demonstrated that it was entitled to an offset for pay in lieu of notice. TYCO Support Brief at 15.

Plaintiff responds to TYCO's argument that he failed to establish a *prima facie* case by asking the Court to take judicial notice of a WARN event without offering any basis upon which to do so. Plaintiff's request for judicial notice highlights the obvious – he can produce no *evidence* that a WARN event occurred. It is beyond

peradventure that summary judgment is appropriate when a plaintiff fails to establish a

*prima facie* case.

> Summary judgment is proper "against a party who fails to make a
> showing of an element essential to the party's case and on which
> that party will bear the burden of proof at trial." In this case,
> Plaintiffs have the burden of proving that a "plant closing" or
> "mass layoff" under the WARN Act occurred. Under the plain
> statutory language, this entails a showing that (1) 50 employees,
> not including part timers, (2) at a single site of employment, (3)
> suffered an employment loss. Thus, at the summary judgment
> stage, Plaintiffs were required to adduce evidence from which a
> jury could reasonably conclude that 50 or more employees at [a
> single site] suffered an employment loss.

Johnson v. Telespectrum Worldwide, Inc., 2002 WL 54693 (3d Cir. 2002) (attached

hereto as Exhibit C). Plaintiff cannot offer any evidence to show how many people were

terminated at a single site of employment. Plaintiff's request for judicial notice similarly

does not establish whether there was a WARN event as defined by the act.

Consequently, Plaintiff cannot prove an essential element of his claim and it should be

dismissed.

### E.   TYCO is Entitled to Summary Judgment on Plaintiff's Breach of Contract Claim.

Previously, TYCO demonstrated that Plaintiff's vacation policy is not a

contractual matter in Pennsylvania. Pennsylvania is an employment at will state. See

Stumpp v. Stroudsburg Municipal Auth., 658 A.2d 333 (Pa. 1995). Under Pennsylvania

law, employee handbooks and the terms and conditions of employment are not

contractual in nature. See Rutherford v. Presbyterian-University Hospital, 417 Pa. Super.

316 (1992). Thus, Plaintiff's characterization of his vacation agreement as a "contract" is

invalid under Pennsylvania law. Consequently, TYCO is entitled to summary judgment

on this claim.

Alternatively, TYCO demonstrated that it afforded Plaintiff pay in lieu of time off consistent with its handbook provisions and Plaintiff has failed to show how and in what manner he is entitled to the relief he demands.

### F. TYCO is entitled to Summary Judgment on its counterclaims.

#### 1. Erroneous payment

Previously, TYCO demonstrated that it erroneously paid Plaintiff $19,355, less applicable payroll deductions, on the mistaken belief that Plaintiff had executed a release entitling him to those funds. Plaintiff, in response to TYCO's counterclaim, responds by stating: 1) Plaintiff was a Tier 1 and entitled to it anyway, and 2) that he would have executed a release, so he should reap the benefits as if he had done so. Plaintiff's Opposition Brief at 14.

Plaintiff's arguments fails because, as demonstrated above, he was a Tier 3 participant in the 1998 Plan. Furthermore, Plaintiff's naked assertion that he was willing to sign the release does not entitle him to the funds. The release, if executed, would have barred this suit. It was to prevent actions such as this and their attendant cost that TYCO offered the additional two months' salary in exchange for the release. Plaintiff cannot have the benefit of the funds and still bring the lawsuit.

In fact, TYCO demonstrated that, based on a mistaken belief that Plaintiff executed a release, it made an erroneous payment to Plaintiff. Facts, ¶¶ 52, 54. See Hartzfeld v. Snyder Township School District, 170 A.2d 355 (Pa. 1961); see also Fidelity Bank v. Tiernan, 375 A.2d 1320 (Pa. Super. 1977). TYCO is entitled to summary judgment on its first counterclaim.

### 2.      Over-payment.

TYCO also demonstrated that, under the terms of the 1998 Plan, it was

entitled to an offset of severance benefits paid by the amount of WARN pay.  Plaintiff

never addressed this argument and effectively concedes it.  TYCO relies on its earlier

filing to support its motion for summary judgment.  In addition, TYCO notes that the

offset here is not an offset of WARN pay by the amount of severance.  Rather, the offset

is a reduction of severance by the amount of WARN pay.  This is an important

distinction, as the terms of the plan specifically provide for this offset, and WARN does

not prevent the offset.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, TYCO respectfully requests that this Court

grant its Motion for Summary Judgment, dismiss Plaintiff's claims with prejudice and

enter judgment in favor of TYCO on its counterclaims against Plaintiff.

Respectfully submitted,

VINCENT CANDIELLO
G. SCOTT PATERNO
One Commerce Square
417 Walnut Street
Harrisburg, PA  17101-1904
717 237-4000

Of Counsel:

MORGAN, LEWIS & BOCKIUS LLP

Dated:  February 25, 2002



HARRIS BOOKER GORINI V. AMP, INC., ET AL.

AUGUST 16, 2000

Page 1 to Page 119

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
9th Floor
Philadelphia, PA  19103-2921
Phone:  215-963-5000

$\varepsilon \times$
A

HARRIS BOOKER

BSA XMAX(22/22)

AUGUST 16, 2000

GORINI V. AMP, INC., ET AL.

## Page 85

(1)     A   They would not have done that.

(2)     Q   They would not have done that.  So who did that?

(3)     A   It would have been my job.

(4)     Q   That would have been your job, so you determined
(5)who the board of directors intended to be a Tier 1
(6)employee?

(7)     A   No, at the board level there were specific
(8)discussions and clear understanding that Tier 1 would be
(9)everybody who was an officer of the company, and let me
(10)though add a gloss on that, who did not already have a
(11)golden parachute agreement with the company.

(12)     To harken back to the earlier -- some earlier
(13)testimony, our officer group was comprised of corporate
(14)officers and divisional officer.  The corporate officers
(15)all had golden parachutes, and, therefore, they had board
(16)authorized specific severance protection in the event of a
(17)change of control, whereas the divisional officers did not.

(18)     Q   Would you look at Exhibit BF-2 for me real quick.
(19)On that exhibit there's a heading about halfway down the
(20)page.  It begins divisional officers.

(21)     A   Uh-hum, uh-hum.

(22)     Q   Were those the Tier 1 employees?

(23)     A   The divisional officers, and there were three
(24)specific corporate level staff directors who the board --
(25)or the comp. committee of the board.  When I'm saying the

## Page 86

(1)board here by the way, let me go back.  This was a meeting
(2)of the compensation committee of the board which was four
(3)of the directors.

(4)     Q   Do you know who they were?

(5)     A   Sure.

(6)     Q   Who were they?

(7)     A   Ralph DiNunzio was the chairman.  I'd have to get
(8)a list of our directors.  I'm really blanking.  Paul
(9)Schlomer, S-c-h-l-o-m-e-r, was a member.  John Morley,
(10)M-o-r-l-e-y, and there was a fourth.  I would need to look
(11)at, you know, other historical records.

(12)     Q   That's okay.  If you don't recall, you don't
(13)recall.

(14)     A   But there were -- I recall there were four
(15)members of the comp. committee who were present and
(16)involved in these discussions.  In any event, the
(17)discussion and the decision that they made was that Tier 1
(18)would be comprised of the divisional officers, and again
(19)that was the officer group who didn't have parachute
(20)agreements, and there was a discussion of there were three
(21)considered critical corporate staff level directors who
(22)were very high profile in our change of control fight who
(23)should be treated for severance purposes just like the
(24)divisional officers, and those three people were the guy in
(25)charge of investor relations who was named Wilburn,

## Page 87

(1)W-i-l-b-u-r-n, the woman in charge of corporate finance
(2)which was Jackie Heisse, and then the person in charge of
(3)public -- well, of communications and public relations who
(4)was named Skaare, S-k-a-a-r-e, but the divisional officers
(5)and those three management designated corporate staff
(6)people would be Tier 1.

(7)     Q   Who made the determination of those three people
(8)that you just named as being included as critical
(9)directors?

(10)     A   At that point the management team was still
(11)Bill Hudson, Jim Marley and Bob Ripp, and they might have
(12)had their CFO Bill Urkiel involved in their discussions,
(13)too.

(14)     Q   They made the decision?

(15)     A   They made the decision that those were the three
(16)people, that if they walked out there there would be a
(17)fundamental breakdown in how the company was managing the
(18)fight of the change of control.

(19)     Q   So it wasn't the board of directors who made that
(20)decision?

(21)     A   Well, those are the ones who determined who
(22)should be recommended to the board of directors for
(23)inclusion in Tier 1, and the board of directors took their
(24)recommendation, so I mean ultimately, you know, the board
(25)of directors -- they weren't rubber stamping whatever came

## Page 88

(1)by, but they didn't question that recommendation.

(2)     In those same discussions with the compensation
(3)committee of the board, what was described to them and
(4)approved by them was that Tier 2 would be everybody else
(5)who wasn't in Tier 1 who had been identified by management
(6)over time as being of such a critical level of employee
(7)that they would be put in what we called our stock option
(8)program, and so Tier 2, you know, as discussed and agreed
(9)to by the comp. committee of the board was to be, if you
(10)will, that next cut of the management structure of the
(11)company with the common denominator for being in that group
(12)being that they had to have been previously nominated by
(13)and approved for participation in what we called our stock
(14)option program.

(15)     Q   Can you tell me where those particular employees
(16)would be identified as Tier 2 employees underneath the
(17)terms of the 1998 severance plan?

(18)     A   You know, in the absence of a Schedule B
(19)attached, you would have to look at extrinsic -- you would
(20)have to look for extrinsic evidence of what was Schedule B
(21)supposed to be comprised of.

(22)     Q   There wasn't a Schedule B, was there?

(23)     A   I never prepared -- well, let me back up.  At the
(24)time this thing was published, you know, in the fall of
(25)'98, there was not a Schedule A or B attached to it.

## Page 101

(1) of his notice period.

(2)     Q     Okay.  So you don't know if any effort was made

(3) whatsoever to verify that information?

(4)     A     From first -- you know, I did not make the

(5) effort.

(6)     Q     Okay.  Did you direct Mark Smith to make the

(7) effort?

(8)     A     No, I don't recall directing him, but I would

(9) have assumed the effort would have been made to verify both

(10) the vacation issue and the length of the WARN notice

(11) issue.

(12)     Q     When you made the determination that Joe Gorini

(13) was not a Tier 1 or Tier 2 employee, did you rely on any

(14) writing in making that determination?

(15)     A     Well, there are minutes of that comp. committee

(16) meeting.  There were exhibits -- this would be the August

(17) of '98 comp. committee meeting.  There were exhibits either

(18) prepared by me or by outside advisors who came into the

(19) meeting to talk about the implementation of this plan that

(20) would have defined tiers.

(21)     Q     And they would have listed by name the people

(22) that were members of those tiers?

(23)     A     No, they would have described who it is that's

(24) intended to be in each tier.

(25)     Q     So they would have --

## Page 102

(1)     A     It would not have been a list by name.

(2)     Q     It wouldn't have been a list of employees?

(3)     A     No.

(4)     Q     Would it have been a list by title?

(5)     A     It would have been a list by description of what

(6) attributes do you have to have in order to be in this

(7) group.

(8)     Q     What attributes did you need to have to be a

(9) member of the group?

(10)     A     Of which group now?  Of Tier 1?

(11)     Q     Of Tier 1.

(12)     A     You had to be a divisional vice-president or you

(13) had to be one of these three then -- these three then

(14) identified corporate staff level people to be in Tier 1,

(15) and to be in Tier 2 you would have to have previously been

(16) identified by your management to be a stock option

(17) recipient under our stock option plan.  Tier 3 would have

(18) been the rest of Band M, and then Tier 4 would have been

(19) everybody else who was exempt from the Fair Labor Standards

(20) Act.

(21)     Q     Are you aware of any plan document that sets

(22) forth those definitions of participants?

(23)     A     Of a plan document, I'm not aware of any.

(24)     Q     Okay.  Before you were with AMP, you said you

(25) were engaged in the practice of law?

## Page 103

(1)     A     I was.

(2)     Q     What firm were you with?

(3)     A     It was a firm head quartered in Cleveland, Ohio,

(4) called Thompson, Hine, H-i-n-e, & Flory, F-l-o-r-y.

(5)     Q     What type of work -- you were an employee

(6) benefits attorney there?

(7)     A     That was the primary thrust of what I did for

(8) them.

(9)     Q     Now, at the time of the merger, the takeover by

(10) Tyco of AMP, did AMP have an AMP Incorporated pension

(11) plan?

(12)     A     Yes.

(13)     Q     And did that plan cover all of AMP's employees?

(14)     A     AMP had various -- I'll back up.  First of all,

(15) it did not cover any non-U.S. employees, but within the

(16) U.S. AMP had various either subsidiaries or divisions,

(17) usually ones that had been acquired from the outside, the

(18) employees of which did not participate in the pension

(19) plan.

(20)     Q     Okay.

(21)     A     So that's a long answer, so, no, it didn't cover

(22) everybody, but it did cover the vast bulk of the U.S.

(23) workforce.

(24)     Q     All right.  It covered people that were AMP

(25) Incorporated company employees but not its subsidiaries and

## Page 104

(1) then just the employees that were in the U.S.?

(2)     A     Here and there were subsidiaries that did

(3) participate, so I can't make a general statement, but it

(4) covered, you know I think 80 plus percent of the U.S.

(5) employees.

(6)     Q     That plan would have covered Joe Gorini?

(7)     A     It would have.

(8)     Q     Being a regular AMP employee in the U.S.?

(9)     A     (Nods head up and down.)

(10)     Q     Okay.  Did AMP Incorporated have an employee

(11) savings and thrift plan?

(12)     A     It did.

(13)     MS. ZUCKER:     Excuse me.  You didn't get an answer

(14) verbally to your last question on the record.

(15)     BY MR. BROWN:

(16)     Q     I'm sorry.  The AMP Incorporated pension plan,

(17) did that cover Joe Gorini?

(18)     A     It did.

(19)     Q     Okay.  The AMP Incorporated employee savings and

(20) thrift plan, did that plan cover all AMP Incorporated

(21) main -- and when I'm saying AMP Incorporated I'm not

(22) talking about its subsidiaries or its brother and sister

(23) corporations or its parent corporations.  Did the AMP

(24) Incorporated employee savings and thrift plan cover all

(25) U.S. AMP employees?

Joseph P. Gorini v. AMP, Incorporated Mark A. Smith

Volume I, July 28, 2000

Joseph B. Gorini v. AMP, Incorporated

Page 1 to Page 226

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
9th Floor
Philadelphia, PA  19103-2921
Phone:  215-963-5000

Ex
B

## Page 157

(1) II participant?

(2) A.   We offered him the opportunity to present the
(3) information that he had that would have
(4) convinced us to change our position, company's
(5) position.  I mean, there certainly isn't any
(6) documentation we refused to receive.

(7) Q.   Is there any documentation that you refused to
(8) respond to?

(9) A.   Documentation?

(10) Q.   Yes.

(11) A.   We responded to any document request we thought
(12) we were obligated to respond to.  There would
(13) have been things that we wouldn't have felt
(14) necessary to respond to.

(15) Q.   And did you consult with the Employees
(16) Retirement Income Security Act or refer to it
(17) when you were determining what you felt you
(18) were obligated to respond to?

(19) A.   That would have been part of our analysis.

(20) Q.   Did you consult with that act?

(21) A.   I didn't consult with the act.

(22) Q.   Did you review it?

(23) A.   No, I didn't review it.

(24) Q.   No, you didn't review it.  Do you know if
(25) anybody else did?

## Page 158

(1) A.   I don't know.  You'll have to ask them.

(2) Q.   Are you aware of whether or not the Employees
(3) Retirement Income Security Act has a
(4) requirement relative to the disclosure of plan
(5) documents?

(6) A.   Yes, there is language that talks about
(7) disclosure.

(8) Q.   And are you aware of whether or not that
(9) language deals with the disclosure or provision
(10) of plan documents to a participant if the
(11) participant requests them?

(12) A.   There are requirements in ERISA dealing with
(13) those.

(14) Q.   Does an employer have to provide an employee
(15) with copies of annual reports if the employee
(16) is a participant and requests them?

(17) A.   In certain circumstances, yes.

(18) Q.   With regards to a severance plan?

(19) A.   I'm not specifically aware.  I believe that we
(20) do include our severance pay plan in our
(21) summary annual report that's annually
(22) distributed.  I mean, it is part of a
(23) consolidated summary annual report that goes
(24) out to anyone who's a participant in any of
(25) those programs.

## Page 159

(1) Q.   And you are aware that plaintiff through
(2) plaintiff's counsel did request annual reports
(3) for the severance plans?

(4) A.   Annual reports?

(5) Q.   Yes, also known as Form 5500.

(6) A.   If that was part of the request.  I don't
(7) recall specifically each item that was
(8) requested.

(9) Q.   But you know that no annual reports were
(10) provided to plaintiff relative to the 1998
(11) severance plan or the change in control plan?

(12) A.   There was none available.

(13) Q.   That's right.  None were ever filed with the
(14) IRS or the Department of Labor, were they?

(15) A.   It was determined that they were not to be
(16) filed.

(17) Q.   Why was that determination made?

(18) A.   Because the plan was not in existence in 1998
(19) for purposes of filing a Form 5500.

(20) Q.   Wasn't it adopted on August 20th, 1998?

(21) A.   It wasn't in existence in the sense that it had
(22) not been triggered because there was no change
(23) in control and, therefore, we determined — you
(24) are granted broad discretion by ERISA to
(25) determine when and how many plans you have.  In

## Page 160

(1) the welfare plan arena it's not quite as
(2) strictly construed as it is in the retirement
(3) plan area.  So you have quite a bit of
(4) discretion to determine how many welfare plans
(5) you have, when they came into existence, when
(6) and how you file 5500s, whether you consolidate
(7) and include more than one plan on a 5500.

(8) Q.   Was it in existence in 1999, the change in
(9) control plan?

(10) A.   Yes.

(11) Q.   And when did it come into existence?

(12) A.   Once the eligibility criteria was triggered and
(13) the change in control occurred.

(14) Q.   So would that have been April 29th?

(15) A.   It would have been effective with the date of
(16) change of control.

(17) Q.   Early April?

(18) A.   Yes, I believe you would construe the merger to
(19) be a change of control.

(20) Q.   So sometime in 2000 a Form 5500 has been or
(21) will be filed for —

(22) A.   It will be filed on or before October 15th.

(23) Q.   On or before October 15th.  Are you aware of a
(24) distinction between a plan description and a
(25) summary plan description underneath ERISA?

Slip Copy
**Unpublished Disposition**

**(Cite as: 2002 WL 54693 (3rd Cir.(Del.)))**
**H**

This case was not selected for publication in the Federal Reporter

NOT PRECEDENTIAL

Only the Westlaw citation is currently available.

NOTICE: Third Circuit Rule 21(i) states citations to federal decisions which have not been formally reported should identify the court, docket number and date.

(The Courts's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.)

United States Court of Appeals,
Third Circuit.

**Renecia JOHNSON, Lorraine Kennedy, Lynette Addison, individually and on behalf of all others similarly situated,**
**v.**
**TELESPECTRUM WORLDWIDE, INC., a Delaware corporation Renecia Johnson, Lorraine Kennedy and Lynette Addison, Appellants.**

**No. 01-1985.**

Submitted Under Third Circuit LAR 34.1(a) Jan. 7, 2002.
Jan. 15, 2002.

Appeal from the United States District Court for the District of Delaware   (D.C.Civ.No.97-cv-00433). District Judge: Honorable Sue L. Robinson.

Before MANSMANN, RENDELL and FUENTES, Circuit Judges.

MEMORANDUM OPINION OF THE COURT

MANSMANN, Circuit Judge.

*1 Renecia Johnson, Lorraine Kennedy and Lynette Addison, the named plaintiffs in this class action on behalf of all persons formerly employed by Telespectrum Worldwide, Inc. at its site in Wilmington, Delaware, sought statutory damages as a result of Telespectrum's alleged violation of the WARN Act. Plaintiffs appeal from an order of the

District Court granting summary judgment to Telespectrum. Because the District Court correctly held that Plaintiffs failed to establish a prima facie case where they failed to establish the threshold number of employment losses required to trigger the protection of the WARN Act, we will affirm the order of the District Court.

I.

The parties are familiar with the factual and procedural history underlying this matter. Accordingly, we turn directly to the merits of Plaintiffs' appeal.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In this case, Plaintiffs have the burden of proving that a "plant closing" or "mass layoff" under the WARN Act occurred. Under the plain statutory language, this entails a showing that (1) 50 employees, not including part-time employees, (2) at a single site of employment, (3) suffered an employment loss. See 29 U.S.C. §§ 2101 and 2102. Thus, at the summary judgment stage, Plaintiffs were required to adduce evidence from which a jury could reasonably conclude that 50 or more employees at the Wilmington site suffered an employment loss. *See, e.g., United Mine Workers of America v. Florence Mining Co.,* 855 F.Supp. 1466, 1476 (W.D.Pa.1994) ; *May v. Shuttle, Inc.,* 129 F.3d 165, 174 (D.C .Dir.1997).

We have carefully reviewed the record in the matter, devoting attention to the employee information and summaries submitted to the District Court. We find that the District Court correctly concluded that Plaintiffs presented insufficient evidence to create a genuine issue of material fact as to whether 50 or more employees (other than excluded employees) experienced an employment loss.

After reviewing the questionnaires, the District Court concluded that less than 50 individuals had been identified and noted that much of the information provided by Plaintiffs in the form of a summary chart was incomplete and inaccurate.

Indeed, of the 55 employees Plaintiffs contends meet the threshold requirements, five indicated they had "quit" employment at Telespectrum. Plaintiffs assert these employees should nonetheless be counted because they may have ceased employment due to a lack of work, Telespectrum's closing of its night shift or its announcement of closing of the Wilmington site. To the contrary, WARN decisions have uniformly held that employees who voluntarily forego an opportunity to continue their employment do not suffer an employment loss, and the Final Rules indicate that the voluntariness of a departure may be called into question only in light of evidence of coercion, creation of a hostile or intolerable work environment, application of undue pressure by the employer or similar circumstances. Plaintiffs have offered no such evidence and accordingly those employees who quit are properly deducted from the number of employees suffering "employment loss." Similarly, Plaintiffs assert that a sixth employee who indicated she ceased employment "over a misunderstanding with a supervisor" should be counted because she may have quit or her discharge may not have been "for cause." Again, Plaintiffs have failed to provide any evidence to establish a question of material fact as to whether this employee suffered an employment loss. Because Plaintiffs have clearly not met the threshold requirements necessary to trigger notice provisions under the WARN Act, we need not address the remaining disputed employees.

II.

*2 For the reasons set forth above, we will affirm the order of the District Court.

JUDGMENT

This cause came to be considered on the record from the United States District Court for the District of Delaware and was submitted under Third Circuit LAR 34.1(a) on January 7, 2002.

On consideration whereof, it is now here ordered and adjudged by this court that the judgment of the District Court entered on March 23, 2001, be and the same is hereby affirmed.

Costs taxed against appellants.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing TYCO Electronics Corporation's Reply to Plaintiff's Brief in Opposition to TYCO's Motion for Summary Judgment has been served via first class mail, postage prepaid, on the **25th day of February, 2002,** upon the following:

> Patricia Carey Zucker, Esquire
> Michael V. Brown, Esquire
> Elliot, Reihner, Siedzikowski, Egan & Balaban
> Governors' Row
> 27 N. Front Street
> P.O. Box 1284
> Harrisburg, PA  17108-1284

G. SCOTT PATERNO