IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH GORINI,            :
          Plaintiff       :
                          :
     v.                   :          CIVIL ACTION NO. 1:CV-99-2215
                          :          (Judge Kane)
AMP INCORPORATED, or its  :
successor in interest, TYCO :
ELECTRONICS, INC.,        :
          Defendant       :

**FILED**
**HARRISBURG**

MAY - 8 2002

MARY E. D'ANDREA, CLERK
Per_____
          DEPUTY CLERK

### MEMORANDUM & ORDER

Now before the Court are the parties' cross motions for summary judgment. Defendant TYCO Electronics, Inc., ("TYCO"), as successor in interest to AMP Incorporated ("AMP"), has filed for summary judgment in its favor on Plaintiff's claims and on Defendant's counterclaims. Plaintiff Joseph Gorini has filed for summary judgment in his favor on his claims and on Defendant's counterclaims. The motions have been fully briefed and are ripe for disposition. For reasons explained below, the Defendant's motion will be granted in part and denied in part, and the Plaintiff's motion will be granted in part and denied in part.

This case arises out of a reduction in force during which Plaintiff was terminated from his employment with AMP. Plaintiff filed this suit pursuant to Employee Retirement Income Security Act of 1974 ("ERISA") to recover severance benefits under two plans maintained by AMP. Plaintiff also claims that his former employer denied his requests for information in violation of ERISA. Plaintiff further alleges that AMP violated the Worker Adjustment and Retraining Notification Act of 1998 ("WARN Act"), which requires employers conducting plant closings and mass layoffs to conform to certain notification requirements. While Plaintiff received pay for some of the vacation days he had accrued but not taken, Plaintiff asserts that he

is due more pay in lieu of vacation time he had accrued.  The Defendant has filed counterclaims to recover monies it claims to have paid Plaintiff in excess of that required.

## I    **Introduction**

Plaintiff Joseph Gorini was employed with AMP from January 9, 1995 until he was released from employment during a reduction in force in 1999.  The Defendant claims that it attempted to deliver notice of his termination to Plaintiff by letter dated April 29, 1999. However, it is undisputed that Plaintiff received actual notice of his termination on May 3, 1999. The termination became effective June 27, 1999, although he was not required to report to work after May 3, 1999.  He continued to receive salary and benefits until June 27, 1999.  Although he worked in various capacities during his tenure with Defendant, at the time of his release from employment Plaintiff's title was "Director, Competitive Intelligence Network."

Plaintiff negotiated five more paid vacation days than the ten days Defendant normally allowed its employees.  Ron Vance who, as Defendant's Director of Systems Services, agreed to this total of fifteen paid vacation days per year, and designated them as additional, negotiated vacation days and not "personal time."  E-mail dated 1/25/95.  During the reduction in force, Defendant paid its employees for accrued and unused vacation days.  However, it only paid for days that were part of the "official vacation allotment" under the Employee Handbook.  Def's Stmt. of Undisputed Material Facts at ¶65.  Therefore, although Plaintiff had not used any of his fifteen annual vacation days, he was only paid for five days of accrued and unused vacation time.

At the time of the reduction in force, Defendant maintained two ERISA plans providing severance benefits.  The AMP Incorporated Severance Pay Plan was first made effective in 1991 and was amended on March 1, 1999 (together, "the 1991 Plan").  The 1991 Plan names AMP as the fiduciary and administrator.  The 1991 Plan included a basic severance pay (§ 4) and an

2

enhanced severance (added by amendment in 1999).  The enhanced severance divided employees into six groups eligible for different severance benefits.  Under the highest level, "Divisional Officers and management-designated Corporate Staff Directors" were to receive a minimum benefits of six months salary under the enhanced severance benefit plan.   However, nothing in the plan documents defines the term "management-designated Corporate Staff Directors."  To be eligible for the enhanced severance benefits, each employee was required to execute a separation agreement and release.  By the clear language of the Amendment, the enhanced severance benefits was an addition, not a replacement to the existing § 4 of the 1991 Plan.  Defendant, in its sole discretion, could elect to offer benefits under the enhanced severance benefit, the basic severance benefit, or none at all.

Additionally, Defendant maintained the AMP Incorporated Employee Severance Plan ("the 1998 Plan"), and administered it through a committee of AMP executives.  The 1998 Plan created four classes, called "Tiers", of employees eligible to participate in the Plan.  The Tier in which an employee was placed determined the benefits for which that employee was qualified. Tier 1, described in the plan document as "any employee of the employer listed in Schedule A attached hereto," offered the greatest level of benefits.  For an as-yet unexplained reason, however, the Defendant never created Schedule A or Schedule B, which identified Tier 2 participants.  Plaintiff was classified by Defendant as a Tier 3 participant when he was terminated.  However, Plaintiff claims that he was a Tier 1 participant.     On May 3, 1999, Plaintiff received two letters from Defendant advising him of his termination.  One letter, dated April 29, 1999, informed Plaintiff of his termination from employment.  The second, dated April 28, 1999 told Plaintiff to cease reporting to work, and that he would remain on the Defendant's payroll until June 27, 1999.  The April 28, 1999 letter informed Plaintiff that he would receive "4

months of pay in accordance with the [1998 Plan]." While the letter mentioned a release, the letter did not state that the grant of four months of salary was contingent upon it. That letter also promised that Plaintiff would be paid for accrued and unused vacation.

Defendant issued a third letter on May 22, 199, which was dated April 29, 1999 but marked "Revised Copy printed 5/14/99" ("the May 14, 1999 letter"). Under the heading "Enhanced Severance," the May 14, 1999 letter informed Plaintiff that he would receive "2 months of severance pay in the amount of $19,335 in accordance with the [1998 Plan]." That letter also informed Plaintiff that he would receive an "additional lump sum severance amount of $19,335" in consideration for executing a Release and Related Agreement. On June 25, 1999, Plaintiff received a check from Defendant, which he deposited, for an amount equal to two months salary. On September 30, 1999, Defendant sent Plaintiff an additional amount equal to two months' salary which he deposited. Defendant claims that it sent the second check in the mistaken belief that Plaintiff had signed the release. But Plaintiff never executed a release, and Defendant now seeks repayment of those two months' salary. The May 14, 1999, letter also affirmed that Plaintiff would be paid for accrued and unused vacation.

Plaintiff, through counsel, requested plan documents in a letter to Defendant on June 23, 1999. On July 20, 1999, twenty-seven days later, Defendant provided Plaintiff with copies of plan documents for the 1991 and 1998 Plans. The copy of the 1998 Plan document did not contain a Schedule A or Schedule B, the nonexistent schedules discussed above, nor did Defendant explain their absence to Plaintiff. After this suit was filed and discovery commenced, Defendants disclosed to Plaintiff that the schedules had never been created. At the time of Plaintiff's request for plan information, there existed an Annual Report for the 1991 Plan, yet, Defendants did not produce it until June 26, 2000. No Annual Report for the 1998 Plan existed

4

at the time of Plaintiff's request.  Two months after Defendant responded to Plaintiff's request, Defendant created an annual report for the 1998 Plan but did not send it to the Plaintiff.

**II      Standard of Review for Summary Judgment**

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. Pro. 56.  A factual dispute is material if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is genuine only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id. at 249.  The nonmoving party receives the benefit of all reasonable inferences.  Sempier v. Johnson & Higgins, 45 F.3d 724, 727 (3d Cir. 1995).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in the complaint.  Instead, [it] must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (internal quotations marks omitted).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial."  Id. at 322.

**III     Standard of Review for ERISA Claims**

A beneficiary may challenge ERISA benefit eligibility determinations under 29 U.S.C. §

1132(a)(1)(B).[1]  An ERISA plan administrator's decision to deny benefits is reviewed "under a de novo standard unless the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms, in which cases a deferential standard of review is appropriate." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

It is undisputed that the 1991 Plan contains the following delegation of authority: "The Company shall have the full and absolute discretionary power and authority to administer the Plan and to interpret provisions hereof, and the Company's actions with respect hereto shall be binding and conclusive upon all Participants and other interested persons for all purposes." Compl. Ex. B at ¶ 6.  The 1998 Plan contains the following language: "The Plan Administrator shall administer the Plan and may interpret the Plan, prescribe, amend, and rescind rules and regulations under the Plan and make all other determinations necessary or advisable for the administration of the Plan, subject to all of the provisions of the Plan." Compl. Ex A at ¶ 3.3. This language gives the Plan administrator Firestone discretionary authority.[2]

Plaintiff presents two reasons why this Court should not use the deferential arbitrary and capricious standard of review.  First, he asserts that the arbitrary and capricious standard of review does not apply under the recent case of Gritzer v. CBS, Inc., 275 F.3d 291, 295 (3d Cir. 2002), because the Plan administrator did not actually exercise discretion in the course of

---

[1]  ERISA plan participants and beneficiaries may bring civil actions "to recover benefits due [them] under the terms of [their] plan, to enforce [their] rights under the terms of the plan, or to clarify [their] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

[2]  The parties disagree on the nature and degree of discretion this language confers on the administrator.  However, because this Court concludes that de novo review applies in this case, this dispute need not be resolved.

denying benefits.  Second, Plaintiff argues that, even if the standard of review should be

deferential under Firestone, it should be heightened under Pinto v. Reliance Standard Life Ins.

Co., 214 F.3d 377 (3d Cir. 2000), because the administrator, Defendant, was operating under a

conflict of interest.  Although it had ample opportunity to do so, Defendant failed to address

either of these arguments.

   Plaintiff relies on Gritzer to support his argument that a de novo standard should apply to

this Court's review of the denial of severance benefits.  That case held that, even when a plan

gives the administrator discretion, Firestone deference should not be used when a denial is

arbitrary because "it is the [administrator's] analysis, not his or her right to use discretion or a

mere arbitrary denial, to which a court should defer."  Gritzer, 275 F.3d at 296 (citing Moench v.

Robertson, 62 F.3d 553, 567 (3d Cir. 1995)).

   Plaintiff argues that, "because (1) the Defendant did not utilize claims procedures

contained in the plan documents and (2) there was no reasoning or analysis by a plan

administrator regarding Plaintiff's request for benefits to which this Court should defer," Gritzer

applies and the denial of benefits should be reviewed de novo.  Pl's Br. in Opp. at 2.  In so

arguing, Plaintiff points to the absence of record evidence that the Defendant actually performed

any analysis or ever explained its reasoning.  Certainly, if Defendant did follow its own claims

procedures in denying Plaintiff benefits under the 1991 Plan and denying in part his claims under

the 1998 Plan, it has not provided evidence of it to this Court.  For example, nothing in the

record shows that the denial of claims under the 1991 Plan set forth the administrator's specific

reasons for denial in plain language, any further information necessary to perfect the claim, and

the steps to obtain review of the denial.  1991 Plan at ¶7.  In fact, Defendant makes no attempt to

offer argument or evidence that the administrator explained the reasoning behind the denial at all.

Therefore, the administrator's decision to deny Plaintiff severance benefits under the 1991 Plan

and to deny him Tier 1 benefits (as opposed to Tier 3 benefits) under the 1998 Plan is not due

Firestone deference and will be reviewed de novo.  Gritzer, 275 F.3d at 295.[3]

**IV     Discussion**

      **(a)     Benefits under the 1991 and 1998 Plans**

      Several disputed material facts stand in the way of issuing summary judgment on the

question of whether Plaintiff is due additional benefits under the 1991 and/or 1998 Plans, or

whether Defendant is due repayment of monies already paid.  The disputed issues of material fact

center on the intent of the Plans and include, but are not limited to:  whether Plaintiff, as

"Director, Competitive Intelligence Network," qualified as a "management-designated Corporate

Staff Director"; whether all employees were participants in the 1991 Plan, as Plaintiff claims and

as evinced by the Defendant's 1997 Form 5500 or, as Defendant claims, none were participants;

and whether Defendant offered Plaintiff benefits under the 1991 Plan when it offered "enhanced

benefits" in a separation letter, or whether the "enhanced benefits" in the letter were unrelated to

the 1991 Plan.  Both parties have offered sufficient evidence to create these genuine issues of

---

    [3] As an argument in the alternative to his Glitzer argument, Plaintiff asserts that a heightened arbitrary and capricious standard of review should be used pursuant to Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000).  In Pinto, the Third Circuit instructed a plan administrator's conflict of interest to be taken into account by using a sliding scale "heightened arbitrary and capricious" standard of review.  Id.  Under the Pinto sliding scale approach, a court should examine how the Plan is funded, whether the administrator is independent, whether the administrator had a reason to be concerned about employer/employee relations, and the amount of money at stake.  Plaintiff argues that the conflict of interest inherent in the structure of the instant Plans, where the Defendant both administers and funds the Plan, warrants a heightened arbitrary and capricious standard of review under Pinto.  The Defendant failed to offer any argument or evidence to counter that of Plaintiff.  However, the ruling above on the Gritzer argument obviates any need to address the Pinto argument.

material fact.  Therefore, both motions for summary judgment on this issue will be denied.[4]

**(b)      ERISA Information Requests**

Upon receipt of a written request, an ERISA plan administrator must provide participants

and beneficiaries of the plan with copies of the "latest updated summary plan description, and the

latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or

other instrument under which the plan is established or operated."  ERISA § 104(B)(4); 29

U.S.C. § 1024(b)(4).  Failure to provide the required information within thirty days may, in the

Court's discretion, subject the Defendant to liability of up to one hundred dollars per day per

violation.  ERISA § 502(c)(1)(B); 29 U.S.C. § 1132(c)(1)(B).  Plaintiff alleges that Defendant's

disclosures were deficient for both the 1991 Plan and 1998 Pan.

Defendant devotes much effort to arguing that it can not be held liable for failing to

disclose plan documents because Plaintiff did not request them himself.  It is undisputed that

Plaintiff's attorney made the requests on his behalf.  Defendant cites the US Court of Appeals for

the Sixth Circuit in Bartling v. Fruehauf Corp., 29 F.3d 1062, 1072 (6th Cir.1994), and an

Opinion Letter issued by the Department of Labor in support of this argument.  Bartling held that

a request for information by an attorney representing a participant or beneficiary did not qualify

as a request to which an ERISA administrator was required to respond.  Bartling, 29 F.3d at

1072.  The Department of Labor letter opined that an administrator need not disclose ERISA plan

---

[4] One disputed matter can and will be disposed of herein.  Defendant claims that the
broad discretion granted the administrator in the 1998 Plan allowed the administrator to decide,
upon review of claims, which employees belonged in each Tier.  However, the clear language of
the 1998 Plan disproves Defendant's claim as a matter of law.  The Plan could not have been
intended to give the administrator discretion to decide Tier membership where the Plan clearly
required Tier membership to be completely delineated in attached schedules.  The fact that the
schedules were, by Defendant's own neglect, never created, does not automatically expand the
administrator's discretion beyond that originally delineated in the Plan.

information to a third party unless the participant or beneficiary had authorized in writing the release of the information to that third party.

However, the US Court of Appeals for the Third Circuit, in which this Court sits, considered this precise question and rejected it in <u>Daniels v. Thomas & Betts Corp.</u>, 263 F.3d 66 (3d Cir. 2001). In <u>Daniels</u>, the Third Circuit explicitly, clearly and unambiguously rejected <u>Bartling</u>. The <u>Daniels</u> court found that the Department of Labor's Advisory Opinion Letter applies only to "non-attorney third parties." <u>Daniels</u>, 263 F.3d at 77. Of course, this Court will honor the law of the Third Circuit and hold that Plaintiff's attorney's requests on his behalf constitute a "request" to which an ERISA plan administrator was required to respond.[5]

**(1)      Information Request for the 1991 Plan**

Plaintiff alleges that Defendant's failure to produce the latest annual report for the 1991 Plan was a violation of the ERISA disclosure requirements. Plaintiff also claims Defendant's failure to produce a summary plan description violated ERISA's disclosure requirements. Defendant argues that ERISA does not obligate it to produce any 1991 Plan information to Plaintiff because he was not a participant in the 1991 Plan.

**(A)      Whether ERISA Required Defendant to Disclose Any Information About the 1991 Plan to Plaintiff**

ERISA requires the plan administrator to furnish copies of plan documents only to participants and beneficiaries. 29 U.S.C. § 1024(b)(4). The term "participant," for the purposes of ERISA's disclosure requirement, is defined as "any employee or former employee of an

---

[5] Defense counsel's assertion of this argument, in the face of clear binding precedent to the contrary, greatly troubles this Court. While attorneys should be zealous advocates for their clients, the duty of candor to the Court limits the extent to which attorneys may argue the law. Attorneys cannot satisfy this duty and present a theory rejected by settled binding precedent. The breach is compounded by failure to identify or acknowledge said precedent.

employer . . . who is or <u>may become eligible</u> to receive a benefit of any type from an employee

benefit plan . . . ." 29 U.S.C. § 1002(7) (emphasis added). The term "may become eligible" is a

broad phrase which the United States Supreme Court has interpreted to include "former

employees with a colorable claim to vested benefits." <u>Firestone Tire & Rubber Co. v. Bruch</u>,

489 U.S. 101, 117-18 (1989) (holding that, "[i]n order to establish that he or she 'may become

eligible' for benefits, a claimant must have a colorable claim that . . . he or she will prevail in a

suit for benefits."). A colorable claim is not necessarily a meritorious one. But a colorable claim

is all that is required. <u>Id.</u> "If an administrator has concerns about whether someone requesting

access lacks a colorable claim, it is free to ask for the facts upon which a claim to a benefit is

being made. If . . . it fails to do so, it proceeds at its own risk." <u>Daniels v. Thomas & Betts</u>

<u>Corp.</u>, 263 F.3d 66, 79 (3d Cir. 2001). The clear message from the Supreme Court and Court of

Appeals to ERISA plan administrators is: when in doubt, disclose.

As discussed in Part IV(a) of this Memorandum and Order, it is premature to decide

whether Plaintiff was actually a participant in, and offered benefits under, the 1991 Plan.

However, no disputed questions of material fact exist on the question of whether he was or might

become eligible for benefits under the Plan. That question turns on whether Plaintiff had a

colorable claim for benefits when he requested information about the 1991 Plan in June of 1999.

Plaintiff was terminated in a reduction in force by an employer that maintained two

severance plans. Nothing on the face of the 1991 Plan would appear to exclude Plaintiff from

participating in its benefits. Indeed, he was a "regular, full-time, salaried employee" eligible for

consideration by Defendant for the receipt of benefits under the 1991 Plan. Complaint at Ex. B.

A reduction in force was in the nature of events which could trigger the 1991 Plan. <u>Id.</u> Whether

or not his claim ultimately succeeds, Plaintiff had a colorable claim to benefits under the 1991

Plan.  Therefore, Plaintiff was a former employee who was or might have become eligible for benefits under the 1991 Plan when he made the request for information.  Firestone, 489 U.S. at 117-18.  For purposes of this discussion, then, he was a "participant" to whom the plan administrator was required to furnish with plan documents under ERISA.[6]

Defendant's argument to the contrary disregards both the Supreme Court's mandate and the purpose of the disclosure requirement.  Congress intended the disclosure requirement to make ERISA plan administrators fully inform people who may be eligible for benefits.  Firestone 489 U.S. at 118; 29 U.S.C. § 1002(7).  In instituting the "colorable claims" test, the Supreme Court intended plan administrators to "opt to provide a claimant with the information requested if there is any doubt as to whether the claimant is a 'participant,' especially when the reasonable costs of producing the information can be recovered."  Id.  Defendant's recalcitrance in refusing to disclose 1991 Plan information based on its predetermination that Plaintiff's claim was meritless flies in the face of that intent.

### (B)    The Annual Report for the 1991 Plan

Indeed, Plaintiff was provided with a plan document for the 1991 Plan less than thirty days after his request.  He was not, however, provided with a copy of the latest annual report for the 1991 Plan.  ERISA requires disclosure of the "latest annual report."  ERISA § 104(B)(4); 29 U.S.C. § 1024(b)(4).  The 1997 Annual Report for the 1991 Plan did exist when Plaintiff made the information request, and was not outdated, in that it was the latest annual report.  But it was

---

[6]  Plaintiff's claim is made all the more "colorable" by one of the very documents Defendant refused to disclose -- the 1997 Annual Report for the 1991 Plan.  That report listed all employees as participants, an entry the Defendant now claims was an error.  In a similar vein, the ambiguity in the severance letters sent to Plaintiff following the reduction in force made Plaintiff's claim more than colorable.  The severance letters he received offered enhanced benefits unavailable in the 1998 Plan but available in the 1991 Plan.

not provided within thirty days of the request.  In fact, it was not provided until Plaintiff filed this suit and discovery commenced.  Therefore, summary judgment will be granted in favor of Plaintiff for failure to disclose the 1997 Annual Report for the 1991 Plan within 30 days of Plaintiff's request.[7]  See Hennessy v. Fed. Deposit Ins. Corp., 58 F.3d 908, 924 (3d Cir. 1995) (holding that whether a district court awards a plaintiff monetary damages under § 1132 is a matter of discretion).

### (C)   Summary Plan Description ("SPD") for the 1991 Plan

The 1991 Plan document disclosed to Plaintiff in response to his information request is not entitled "plan description" or "summary plan description."  There is no dispute, however, that the document produced was the only existing document for the 1991 Plan.  It was, therefore, the "instrument under which [the] plan was established or operated."   ERISA § 104(B)(4); 29 U.S.C. § 1024(b)(4).  Further, the plan 1991 Plan document disclosed was not an SPD because it lacked information which an SPD must by law contain, e.g., the employer identification number assigned by the IRS to the plan sponsor and the three-digit plan number assigned by the plan sponsor, the business address and telephone number of the administrator, identification of the person or entity designated to service of process, and a description of participant right under ERISA.  DOL Reg. § 2520.102-3.  Hicks v. Fleming Co., Inc, 961 F.2d 537, 541 (5th Cir. 1992).

Defendants assert that SPDs were never created for the 1991 and 1998 Plans and can not be penalized for not disclosing them.  Plaintiff, citing Jackson v. E.J. Branch Corp., 937 F. Supp.

---

[7]  Plaintiff also claims that Defendant is separately liable for failing to produce the 1998 annual report for the 1991 Plan.  However, that annual report did not exist, and was not required to exist, at the time Plaintiff made his request for information.  For the same reasons discussed in Part VI(b)(2)(B), infra, of this Opinion, Plaintiff can not succeed on his claim that Defendant's failure to produce the 1998 annual report for the 1991 Plan was a violation of ERISA § 502(c).

735 (N.D. Ill. 1996), asserts that an employer has an obligation to provide both a plan description and an SPD, and that one such document can not be both. Because the Defendant did not provide an SPD, Plaintiff avers, it is liable for § 1132(c)(1)(B) penalties.

ERISA requires that any covered plan must prepare and distribute an SPD to employees who are eligible to receive benefits under the plan within ninety days after the employee becomes a participant. 29 U.S.C. §§ 1021(a), 1022 and 1024(b). Copies of the SPD, latest annual report, and the document establishing the plan are required to be available for examination in the principal office of the administrator. 29 U.S.C. § 1024(b)(2). Section 1022(a) provides that plan summaries "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants . . . of their rights . . . ." Section 1022(b) also sets forth specific contents to be included in SPDs.[8] The Department of Labor issues regulations on the style, format, and contents of SPDs.[9] The SPD is a document whose existence is required by ERISA.

_____

[8] Section 1022(b) requires the summary plan description, include: (1) the name and type of administration of the plan; (2) in the case of a group health insurance plan, whether a health insurance issuer is responsible for the financing and administration of the plan and, if so, the name and address of such issuer; (3) the name and addresses of the person designated as agent for service of process; (4) the name and address of the administrator; (5) the name, titles and addresses of trustees; (6) the plan requirements respecting eligibility for participation and benefits; (7) circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; (8) the source of financing for the plan; (9) the identity of any organization through which benefits are provided; (10) the date of the end of the plan year and whether records are kept on a calendar, policy, or fiscal year basis; (11) the procedures to be followed in presenting claims for benefits under the plan including the office at the Department of Labor; (12) the remedies available under the plan for redress of claims which are denied in whole or in part including procedures required under 29 U.S.C. § 1133. 29 U.S.C. § 1022(b).

[9] E.g., 29 C.F.R. § 2520.102-2(a) (the plan description must "apprise the plan's participants and beneficiaries of their rights and obligations under the plan"); 29 C.F.R. § 2520.102-3(j)(2) (SPD for an ERISA welfare plan must include "a statement of the conditions pertaining to eligibility to receive benefits"); 29 C.F.R. § 2520.102-3(l ) (SPD must include "a

There are exceptions to the requirement that an SPD be created.  <u>See, e.g.</u>, <u>Dukes v. U.S. Healthcare, Inc.</u>, 57 F.3d 350 (3d Cir. 1995) (finding an exception to the requirement that an SPD be prepared where the ERISA benefit at issue is a health benefit where the provider is an HMO). However, the Defendant has offered no support for an exception to be made in the case at bar, and this Court is unwilling to create one.  There is strong public interest in assessing non-disclosure penalties for failing to disclose required ERISA documents when the only justification for failure to do so is that they were never created.  As the court in <u>Jackson v. E.J. Branch</u>, 937 F. Supp. 735 (N.D. Ill. 1996), stated:

> [I]t is consistent with the aims of ERISA to impose a penalty on the plan administrator for every day that he fails to provide the document to the participant who requested it.  There is nothing keeping the administrator from preparing a mandatory document where none previously existed, and it is his burden upon threat of penalty to do so. [Otherwise,] it would be too easy for a plan administrator to avoid section 502(c) penalties simply by failing to maintain documents or by destroying them when a participant makes a written request.

<u>Id.</u> at 740 (citing <u>Kascewicz v. Citibank, N.A.</u>, 837 F. Supp. 1312, 1321 (S.D.N.Y. 1993)).

The Defendant's failure to comply with ERISA's reporting and disclosure requirements by preparing and disclosing a summary plan description is a violation of ERISA for which the Court may, at its discretion, award penalties under 29 U.S.C. §§ 1024(b)(4) 1132(c)(1)(B). <u>United Paperworkers Int'l Union, Local 14, AFL-CIO-CLC v. Int'l Paper Co.</u>, 777 F. Supp. 1010 (D. Me. 1991); <u>Dall v. Chinet Co.</u>, 33 F. Supp. 2d 26 (D. Me. 1998) (holding that, if a plan participant requests that the plan administrator furnish him or her with information required to be

---

statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture or suspension of any benefits"); 29 C.F.R. § 2520.102-3(s) (SPD must include a statement describing "[t]he procedures to be followed in presenting claims for benefits under the plan and the remedies available under the plan for the redress of claims which are denied in whole or in part").

furnished automatically under ERISA's disclosure requirements, ERISA provision governing penalty for failure to disclose is triggered and an administrator has thirty days to respond). See, Ackerman v. Warnaco, Inc., 55 F.3d 117 (3d Cir. 1995) (discussing the availability of substantive remedies versus statutory remedies where an administrator failed to fulfill the reporting and disclosure requirements of ERISA). In the exercise of discretion, a penalty will be awarded.

### (2)    Information Request for the 1998 Plan

The Defendant does not dispute that Plaintiff was a 'participant' to whom it was required to disclose information about the 1998 Plan. Defendant did produce one plan document within the thirty-day limit as required by ERISA. Plaintiff alleges that Defendant's response was deficient, however, in that it did not include the Schedule A or Schedule B and did not advise Plaintiff of their non-existence. Plaintiff also alleges that Defendant's failure to produce an Annual Report for the 1998 Plan violated the disclosure requirement of ERISA, as did the failure to produce a summary plan description.

### (A)    Schedule A and Schedule B for the 1998 Plan

The 1998 Plan divides the employees into groups labeled "Tiers" and provides different levels of benefits to each Tier. The plan document says that "Schedule A" and "Schedule B" identify the employees in each of Tier 1 and Tier 2, respectively. Plaintiff, who received benefits as a Tier 3 employee, disputes his categorization and alleges that he should be in Tier 1. Schedule A, which was supposed to identify Tier 1 employees, was therefore very important to Plaintiff in his investigation. The 1998 Plan document Defendant provided to Plaintiff did not contain Schedule A or Schedule B. It was not until after this litigation commenced that Defendants informed Plaintiff that the schedule had never been created.

16

Defendant's disclosure of information for the 1998 Plan was clearly deficient. The plan document is unambiguous in that it requires the schedules. Disclosure of the plan document without the schedules was an incomplete disclosure. Defendant argues simply that it produced all the documents it had created with respect to the 1998 Plan, and that is all that was required of it. Defendant fails, however, to cite authority in support of its argument that failure to produce a complete copy of a document which is required to exist and required to be disclosed, whether or not it exists, is not a violation of ERISA. For the same reasons discussed above, failure to create documents required by ERISA does not excuse a failure to disclose. If such an excuse were permitted, it would allow employers to frustrate and circumvent ERISA rights by failing to create documents in the first place.

ERISA requires a plan administrator to provide the plan's "latest summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract or other instrument under which the plan is established or operated." 29 U.S.C. § 1024 (b)(4). There is no exception in ERISA's disclosure mandate for incomplete documents or attachments that are required by the plan document to exist but do not. Moreover, the penalty provision of § 502(c) is triggered by both refusals to provide requested information, and **failures** to do so. 29 U.S.C. § 1132(c) (emphasis added). This Court agrees with the Plaintiff, and finds that Defendant's failure to furnish a copy of Schedule A and Schedule B within thirty days of his request violated § 502(c) of ERISA.

### (B)     The Annual Report for the 1998 Plan

Plaintiff alleges that the administrator's failure to provide an annual report for the 1998 Plan is a violation of the ERISA disclosure requirements. The undisputed facts show that Plaintiff made his request for information on June 23, 1999. Defendant responded on July 20,

1999. On July 31, 1999, the Defendant sought from the Department of Labor an extension of time in which to file an annual report for the 1998 Plan. The annual report for the 1998 Plan was submitted to the Department of Labor on September 30, 1999. At neither the time of Plaintiff's request nor the time Defendant responded did an annual report for the 1998 Plan exist.

There is an important distinction between Defendant's failure to produce an annual report which did not exist, however, and the failure to produce complete a plan document that was required to exist at the time of the request. An annual report is not necessary for the administration of the plan itself, rather, it is a reporting requirement under which the employer must report to the Secretary of Labor. ERISA did not require an annual report to have been created by the time Plaintiff's request for information was made. 29 U.S.C. § 1024 (a)(1) (requiring "[t]he administrator of any employee benefit plan . . . [to] file with the Secretary the annual report for a plan year within 210 days after the close of such year (or within such time as may be required by regulations promulgated by the Secretary in order to reduce duplicative filing).")

Plaintiff has pointed to no authority to support the proposition that a plan administrator must provide a participant with an annual report which did not exist, and was not required to exist, when the request for information was made and responded to. The language of the statute does not require such disclosure, as it requires disclosure only of the "latest annual report." Nor is there support for the position that an administrator must provide participants with an annual report created after the request for information was made and the thirty day period for responding expired. To hold otherwise would require an employer to send every annual report to every former employee who had ever requested information ad infinitum. There is also no support for the position that ERISA requires the disclosure of Defendant's July 31, 1999 Form 5558

18

requesting additional time in which to file an annual report.  Plaintiff may not sustain the claim

for failure to disclose the annual report for the 1998 Plan, and Defendant's motion for summary

judgement will be granted on that claims.

### (C)     Summary Plan Description for the 1998 Plan

The analysis of Defendant's failure to disclose the SPD for the 1998 Plan mirrors that of

its failure to produce the same document for the 1991 Plan.  Like the 1991 Plan discussed in Part

IV(b)(1)(C) of this opinion, <u>supra</u>, the 1998 Plan document disclosed to Plaintiff is not titled

"plan description" or "summary plan description."  It is the only existing document for the 1998

Plan, and was the operating document.  It was not the SPD for the 1998 Plan.  DOL Reg. §

2520.102-3.  <u>Hicks v. Fleming Co.</u>, 961 F.2d 537, 541 (5th Cir. 1992).  For the same reasons that

Defendant's failure to prepare and disclose the latest SPD for the 1991 Plan was a violation of

ERISA § 104(B)(4), the failure to disclose the latest SPD for the 1998 Plan was such a violation.

For the same reasons, the failure to disclose an SPD for the 1998 Plan merits the imposition of a

penalty of up to one hundred dollars per day per violation under ERISA § 502(c)(1)(B).

### (3)     Penalties

Having found that the Defendant is liable for penalties for failing to disclose the 1997

Annual Report for the 1991 Plan, SPDs for both plans, and Schedules A and B for the 1998 Plan,

this Court must determine what if any penalties are warranted.  For each violation, Defendant is

liable for up to one hundred dollars per day of that violation.  ERISA § 502(c)(1)(B); 29 U.S.C. §

1132(c)(1)(B).  "This amount is a ceiling, not a floor, on the penalty a court may impose."

<u>Boyadjian v. Cigna Co.</u>, 973 F. Supp. 500, 506-07 (D.N.J. 1997).  The violations began, and the

penalties will be calculated, from July 24, 1999, the day after the thirty-day disclosure period

expired.  <u>Id.</u>

19

The purpose of the penalties is to induce plan administrators to comply with ERISA's disclosure provisions, and not necessarily to make the participant whole. Groves v. Modified Ret. Plan for Hourly Paid Employees of the Johns Manville Corp. and Subsidiaries, 803 F.2d 109, 117 (3d Cir. 1986). Congress's intent in enacting the ERISA disclosure requirements was to "ensur[e] that the individual participant knows exactly where he stands with respect to the plan." Firestone 489 U.S. at 118 (citation omitted). A Plaintiff need not show prejudice as a prerequisite to a recovery for the failure to disclose plan information. Moothart v. Bell, 21 F.3d 1499, 1506 (10th Cir. 1994); Porcellini v. Strassheim Printing Co., Inc., 578 F. Supp. 605, 613 (E.D. Pa. 1983). However, it may be taken into account when assessing the penalty. Id. Good faith is not a defense to the failure to provide information. Bova v. American Cyanamid Co., 662 F. Supp. 483 (S.D. Ohio. 1987). Here, Defendant can not claim oversight or error for its nondisclosures -- it is a large employer with staff learned in ERISA who made a conscious choice to decline to disclose. Plaintiff made numerous requests for the annual report, all of which Defendant refused or failed to respond to as ERISA requires.

### (A)    1991 Annual Report

Had the 1997 Annual Report been timely disclosed, it would have shown that all employees were listed as participants of the 1991 Plan. Regardless of Defendant's dismissals of that evidence in its defense to this Court, that statement would have been very informative to Plaintiff in assessing his rights and remedies. Indeed, had Plaintiff not pursued this case and obtained the 1997 Annual Report in discovery, he would not have known of that evidence supporting his case. Plaintiff needed the documents to decide for himself whether he was a participant, whether he was due more benefits than he received, and what to do about it. The Annual Report existed, it was clearly required to be disclosed, and Defendants were recalcitrant

20

in refusing such disclosure, thereby thwarting Congress's intent in enacting the disclosure requirements. For this violation, Defendant is liable for up to one hundred dollars per day from July 24, 1999, the day after the thirty-day disclosure period expired, through June 26, 2000, the date it was finally disclosed to Plaintiff. ERISA § 502(c)(1)(B); 29 U.S.C. § 1132(c)(1)(B). In the exercise of its discretion, the Court will exact the maximum $100 penalty for each day the Defendant refused to disclose the 1997 Annual Report for the 1991 Plan. 29 U.S.C. § 1132(c). The award to Plaintiff for this refusal to disclose will be $33,800, calculated by multiplying $100 per day by 338 days.

### (B)    1991 and 1998 Plan SPDs

The failure to produce the SPD for the 1991 Plan is deserving of a lessor penalty than the failure to disclose the 1997 Annual Report for the 1991 Plan, discussed above, and the failure to produce the Schedules for the 1998 Plan, as explained below. In contrast with the 1997 Annual Report for the 1991 Plan and the Schedules, Defendant's failure to disclose the SPD did not impact Plaintiff's ability to understand his rights and prepare his case. Indeed, there is no evidence to show that, had the SPDs been prepared and disclosed, they would have armed Plaintiff with any more information about his rights under the 1991 Plan. However, Defendant has been remarkable in its recalcitrance in failing to prepare documents as required by ERISA. Indeed, it was Defendant's failure to prepare SPDs in the face of ERISA's requirements which caused their inability to comply with ERISA § 502(c)(1)(B). While the absence of prejudice to the Plaintiff counsels for a lessor penalty, the purposes of ERISA § 502(c)(1)(B), would be ill served by imposing no penalty at all. The purposes of ERISA §502(c)(1)(B) and the rest of the disclosure and recordkeeping provisions would be well served by an award of $20 per day per SPD.

The penalty will be calculated beginning July 24, 1999, after the thirty-day period for disclosure expired. Boyadjian, 973 F. Supp. at 506. As the SPD was never created, the Court will use January 18, 2002, the filing date of the first motion for summary judgment, as the end date of the violation. Therefore, the Court will award a penalty for the failure to disclose the summary plan description for the 1991 Plan in the amount of $18,140, calculated by multiplying $20 per day by 907 days. For the failure to disclose the SPD for the 1998 Plan, the Court will award a penalty in the amount of $18,140, calculated by multiplying $20 per day by 907 days.

### (C)    1998 Schedules A and B

The Schedules were a necessary part of the plan document and without them, the plan document was not completely disclosed. During their investigation of his rights, Plaintiff and his counsel were greatly prejudiced by their inability to view the Schedules, a prejudice which continues to this day. Had the schedules been created and produced as required, this litigation would may not have been necessary. Whatever the schedules had revealed, they would have aided in the prompt disposition of this case, perhaps even before it was filed in this Court. Defendant have proffered not a single shred of evidence to explain the absence of the schedules, evidence unavailable to the Plaintiff. Therefore, this Court will grant Plaintiff's motion for summary judgment on this claim. It hereby imposes the maximum penalty of $100 per day, from July 24, 1999, the day after the thirty-day disclosure period expired, through January 18, 2002, the filing date of the first motion for summary judgment. Therefore, the Court will award a penalty for the failure to disclose the schedules for the 1998 Plan in the amount of $90,700, calculated by multiplying $100 per day by 907 days.

### (b)    WARN Act Claims

The WARN Act provides that, in the event of a plant closing or mass layoff, affected

employees must be given at least sixty days advance notice.[10]  29 U.S.C. § 2102.  An employer

that fails to provide such notice is liable to those employees for "back pay for each day of the

violation." 29 U.S.C. § 2104; Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139,

142 (3d Cir. 1998).  Defendant claims that it attempted to deliver notice of his termination to

Plaintiff by letter dated April 29, 1999.  The Defendant concedes that Plaintiff received notice of

the WARN Act event on May 3, 1999.  He continued to receive salary and benefits only until

June 27, 1999, however, which was five days short of the WARN Act's sixty-day requirement.[11]

Defendant makes a concerted effort to blame the Plaintiff for Defendant's failure to give

proper notice of his termination.  Defendant implies, but offers no evidence, that Plaintiff was

absent without leave from work on April 29, 1999.  The Defendant actually goes one step further

and concludes that Plaintiff "was paid for time in which he did not perform work" because he

was not at his workstation when they attempted to serve him with notice there.  Def.'s Memo in

Support at 15.  The conclusion the Defendant would have the Court draw from the above is that

Defendant's WARN Act liability should be reduced for the days when Plaintiff did not receive

notice because he was "AWOL" and drawing salary for those days.  But the only record evidence

of such is 1) that Plaintiff in his deposition could not recall where he was on April 29, 1999, and

---

[10]  Defendant appears to attempt to argue that the reduction in force during which Plaintiff
was terminated from employment was not a WARN Act event.  In support of that argument,
Defendant staunchly attacks Plaintiff's use of Harris Booker's deposition testimony.  Def.'s Br.
in Opp. at 17.  However, because Defendant completely fails to point to record evidence and
argue how the layoff of 2,500 employees in a single event does not constitute a WARN Act
event, the Court will not dwell on the matter.  The reduction in force was a WARN Act event.

[11]  The Defendant makes much hay of the fact that Plaintiff was not required to report to
work from May 3, 1999, through his official termination date of June 27, 1999.  However,
nothing in the WARN Act reduces the amount of notice an employer must give if the employee
is not required to work during the WARN Act notice period.  Nor has Defendant cited any
authority to support such an argument.

23

2) Defendant's assertion that it served all 2,500 employees that day, so if he did not receive service, it can only be that he was playing hooky. That is not sufficient evidence to support Defendant's argument.

The WARN Act does allow for a reduction in liability for violations of the WARN Act based on "any voluntary and unconditional payment by the employer to the employee **that is not required by any legal obligation**." 29 U.S.C. § 2104(a)(2)(B) (emphasis added). However, the parties have left this question too muddied to be decided on summary judgment. The Court declines, as explained above in Part IV(a) of this Memorandum and Order, to grant summary judgment for either party on the question of how much benefits were due to Plaintiff. Therefore, the issue of whether Plaintiff was over-paid severance benefits remains unresolved. Whether Defendant has already paid Plaintiff more than it was legally obligated to depends upon the resolution of those claims. As the benefits claims and counterclaims survive this Memorandum and Order, so must this claim.

Defendants offer up a third argument in support of summary judgment in its favor on the WARN Act claim. Defendant asserts the "good faith" provision of WARN which provides, in pertinent part:

> If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.

29 U.S.C. § 2104 (a)(1)(B)(4). The parties have proffered insufficient record evidence for the Court to decide, as a matter of law, the good faith of Defendant and the reasonableness of any belief that it was not violating the WARN Act. A reduction made under this section, if any, would be premature. Therefore, both parties' motions for summary judgment on the WARN Act

24

claims will be denied.

### (c)    Vacation Pay Claim

Both severance letters sent to Plaintiff promised pay for accrued and unused vacation. The only remaining issue in this claim is how much leave Plaintiff had accrued by his June 27, 1999, termination date.  Plaintiff asserts, but Defendant denies, that he was entitled to fifteen vacation days per year.[12]  Record evidence shows that Plaintiff was offered, as an inducement to accept employment, and did accept in reliance upon said offer, fifteen vacation days per year. Defendant offers no evidence that Ron Vance, who offered the vacation days on behalf of Defendant, did not have the authority to bind the company.  Defendant even admits that it was standard practice for its managers and directors to negotiate additional days off as an inducement for candidates to accept offers.  Def.'s Br. at 15.  The fact that the Defendant's internal arrangements for keeping track of the extra negotiated vacation days differed from that of the standard company-wide allotment of vacation days does not detract from its agreement. Defendant's assertion of the at-will employment doctrine does not detract from the undisputed facts and the contract between the parties concerning vacation time.  Plaintiff has proffered substantial, unrebutted record evidence that he was indeed entitled to fifteen vacation days.

That does not mean, however, that Plaintiff was entitled to pay in lieu of vacation for fifteen days.  Indeed, Defendant asserts two arguments to the contrary: that the employee

---

[12]  The Defendant takes the curious position of arguing that the 15 vacation day agreement with Plaintiff upon his hiring was not a contract.  However, Defendant's Statement of Undisputed Material Facts states:  "Upon hiring Plaintiff, AMP entered into a **written contract** with Plaintiff for 5 additional vacation days to which he would not have been entitled under AMP's vacation policy in effect at the time of his hire."  Statement of Undisputed Material Facts at ¶ 8 (emphasis added).  Defendant's assertion of this fact undercuts both his argument to the contrary and his credibility with this Court.

handbook in effect in 1999 allows for pay in lieu of vacation for only the third, fourth and fifth weeks of accrued vacation; and that Plaintiff had not accrued fifteen days because the termination occurred part way through the year, so not all fifteen days had accrued.

The record evidence does not support the Defendant's assertion that the employee handbook allowed for pay in lieu of vacation for only the third week of accrued vacation. In so arguing, Defendant cites to ¶¶ 5, 6 & 7, of its Statement of Undisputed Material Facts, which are expressly denied by Plaintiff. Paragraphs 5, 6, & 7 of Defendant's Statement of Undisputed Material Facts refer in turn to exhibits 8-11 to Plaintiff's deposition, which were submitted in the Defendant's Supporting Documents to its Statement of Undisputed Material Facts. However, nothing in the exhibits says what Defendant says that they say. There is no mention of pay in lieu of vacation, or limitations thereof, in the cited exhibits. The Court concludes that the "facts" in Defendant's Statement of Undisputed Material Facts are neither undisputed nor supported by the record.

However, Plaintiff has not rebutted Defendant's argument that Plaintiff is due only a pro rata number of vacation days, because that is all that had accrued by the June termination date. While Plaintiff was due fifteen vacation days per annum, the entire year had not concluded. The next step, then, to determining the number of vacation days Plaintiff had accrued, would be to divide fifteen by the number of months in which the vacation time had accrued. Neither party has suggested a date when the accrual began. The Court is unwilling, in the absence of record evidence, to assume that accrual began on January 1, 1999. Therefore, summary judgment on this issue will be denied.

**(d)    Attorney Fees**

Plaintiff's motion for summary judgment includes a request for attorney fees and costs

26

pursuant to ERISA and WARN.  The request is premature.  As explained above, there remain

triable issues on some of Plaintiff's claims.  At the conclusion of the case, Plaintiff may refile its

motion for such fees and costs and the Court will address it then.  The parties are urged to follow

the Third Circuit's guidelines for such motions, including detailed accounting, affidavits, and

other evidence in support of the motion.  See, e.g., Hensley v. Echerhart, 461 U.S. 424, 433

(1983); Rode v. Dellarcuprete, 892 F.2d 1177, 1183 (3d Cir. 1990); Loughner v. Univ. of

Pittsburgh, et al, 260 F.3d 173 (3d Cir. 2001).

**V**      **ORDER**

**AND NOW**, this ___ of May, 2002, **IT IS ORDERED THAT:**

1.      Defendant's motion for summary judgment (Doc. No. 44) is **GRANTED IN PART AND DENIED IN PART** as follows:

    (a)      Defendant's motion for summary judgment on Plaintiff's claim that Defendant failed to disclose an Annual Report for the 1998 Plan is **GRANTED**;  Final Judgment will be deferred until the conclusion of this action.

    (b)      The remainder of Defendant's motion for summary judgment on Plaintiff's claims and on Defendant's counterclaims is **DENIED**.

2.      Plaintiff's motion for summary judgment (Doc. No. 48) is **GRANTED IN PART AND DENIED IN PART** as follows:

    (a)      Plaintiff's motion for summary judgment on Plaintiff's claim that Defendants failed to disclose the 1997 Annual Report for the 1991 Plan is **GRANTED**;  Final Judgment will be deferred until the conclusion of this action.

    (b)      Plaintiff's motion for summary judgment on Plaintiff's claim that Defendants failed to disclose the Summary Plan Description for the 1991 Plan is **GRANTED**;  Final Judgment will be deferred until the conclusion of this action.

    (c)      Plaintiff's motion for summary judgment on Plaintiff's claim that Defendant failed to disclose Schedule A or Schedule B of the 1991 Plan is **GRANTED**;  Final Judgment will be deferred until the conclusion of this action.

    (d)      Plaintiff's motion for summary judgment on Plaintiff's claim that Defendants failed to disclose the Summary Plan Description for the 1998 Plan is **GRANTED**;  Final Judgment will be deferred until the conclusion of this action.

    (e)      The remainder of Plaintiff's motion for summary judgment on Plaintiff's claims and on Defendant's counterclaims is **DENIED**.

3.      Plaintiff's motion for attorney fees is **DENIED WITHOUT PREJUDICE TO REFILE**.

Yvette Kane
United States District Judge