IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH B. GORINI, | : | CIVIL ACTION NO. 1:CV 99-2215 |
| Plaintiff, | : | |
| v. | : | JUDGE YVETTE KANE |
| AMP INCORPORATED or its Successor In Interest, TYCO ELECTRONICS CORPORATION, | : | |
| Defendants. | : | |

**TYCO ELECTRONICS CORPORATION'S REQUESTS
FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW**

TYCO Electronics Corporation ("TYCO"), through its attorneys, hereby requests the Court make the following findings of fact and conclusions of law:

**I.     FINDINGS OF FACT**

1. AMP Incorporated hired Plaintiff effective January 9, 1995, as Manager, Data Resource Management. **Notes of Testimony ("N.T.") at 57.**

2. Plaintiff testified he reported to Ron Vance as his direct supervisor from the beginning of his employment at AMP until April 1, 1998. **N.T. at 69.**

3. Mr. Vance testified that, during the hiring process, he made a personal commitment on behalf of Systems Services allowing Plaintiff to take five, paid vacation days annually in addition to that which Plaintiff was entitled under AMP's vacation policy in effect at the time of his hire until Plaintiff's tenure qualified him for three (3) weeks of paid vacation. **Plaintiff's Exhibit ("P. Ex.") 29; N.T. at 221.**

4. By providing this commitment in an electronic mail format, Mr. Vance did not need the approval of Human Resources. **N.T. 221.**

5. As an exempt employee, Plaintiff would take the time off as vacation, but it would not be recorded by Human Resources. While Plaintiff worked in Systems Services, Mr. Vance kept track of vacation time informally. **Id. at 223.**

6. While Plaintiff asked that this informal vacation grant be placed in his offer letter, Mr. Vance did not agree to do so because it would require formal approval of Human Resources which never was sought. **Id. 223-24; Defense Exhibit ("D. Ex.") 3.**

7. Brian Cain, Director of Human Resources for the US in 1999, testified he was familiar with additional vacation grants authorized by managers. **N.T. at 259.**

8. In Plaintiff's case, as a new employee, he was entitled to 10 days of vacation under AMP's vacation policy. However, managers could authorize additional time off, whether as compensatory, vacation or personal time. **Id. at 259-260.**

9. During the period in question, Human Resources did not track the time taken by exempt employees, such as Plaintiff. Such an employee was paid regular salary whether at work or when they took time off. It simply was up to the particular manager to track the time. **Id. at 260-261.**

10. Mr. Cain explained that, when an employee separated, only the time permitted under the vacation policy was paid out, which was premised on years of service. **Id. at 261; D. Ex. 24.**

11. The vacation policy was followed unless additional time off was placed in an offer letter. **N.T. at 263.**

12. Given that Plaintiff only had four (4) years of service, he only was entitled to pay for up to 10 days of accrued days in a calendar year. In his case, Plaintiff was entitled to an accrual of one vacation day on the first of each month, to a maximum of 10 days. **Id.** at 263-4; **D. Ex. 24 at Bates Number 100234-100235.**

13. As of his separation on July 1, 1999, Plaintiff accrued seven (7) days of vacation, for which his manager identified that he had taken two (2) days. Therefore, TYCO paid Plaintiff for five (5) days of accrued vacation at the time of his separation of employment. **P. Ex. 27.**

14. On June 24, 1999, TYCO correctly paid Plaintiff his accrued but unused vacation time consistent with how it treated other employees during the reduction in force. **P. Ex. 10; N.T. at 265.**

15. Plaintiff periodically received copies of the AMP Employee Handbook, as amended, from time to time. The Employee Handbook in effect at the time of Plaintiff's separation contained a policy on vacation benefits which covered issues such as the scheduling of vacations, accrual of vacation days, and pay in lieu of vacation. **D. Ex. 24.**

16. Plaintiff testified that, toward the end of his career with AMP, he understood that vacation time accrued at the rate of a day per month. **N.T. at 83.**

17. Plaintiff testified that, effective on January 1, 1996, he held the title and position of Director, Global Information Architecture. **N.T. at 62-63.**

18. Effective April 1, 1998, Plaintiff held the title and position of Director, Special Projects. In TYCO's personnel records, Plaintiff held this title until his

separation, even though he used a functional title in his work product. **D. Ex. 9; P. Ex. 34; N.T. 298.**

19. Plaintiff testified that he never supervised any employees directly after April 1, 1998. **N.T. at 74-75.**

20. Plaintiff testified that, as of April 1, 1998, he no longer worked for Systems Services. **N.T. at 81.**

21. On or about April 29, 1999, TYCO notified affected employees of their future separation of employment, scheduled for 60 days hence on June 27, 1999. **P. Exs. 1, 4.**

22. Plaintiff testified that, on May 3, 1999, he returned to work, following a personal absence, at 449 Eisenhower Boulevard and received notice of his employment separation, scheduled for June 27, 1999. **N.T. at 21, 87, 109; P. Exs. 1, 2.**

23. While Plaintiff testified at deposition that he worked at 441 Friendship Drive, he testified at trial he worked in 449 Eisenhower Boulevard. **N.T. at 70.**

24. There were 86 employees reduced from 449 Eisenhower Boulevard during the reduction effective on June 27, 1999. While Plaintiff failed to adduce the exact number of employees located at 449 Eisenhower Boulevard just prior to the reduction, Brian Cain testified that he believed the number to be around 300, although he felt that the number "could have been" 260, but more likely closer to 300. **P. Ex. 34. N.T. at 290.**

25. TYCO preferred to keep like functions together at building locations. **N.T. 305.**

26. 449 Eisenhower Boulevard alone contained the sales and marketing functions. **Id. at 306.**

27. 449 Eisenhower was located within a geographic area within which were located five other TYCO facilities, referred to by Plaintiff's Counsel as the "Friendship Road Campus." **P. Ex. 40.** These were: 441 Friendship Road, 470 Friendship Road, 3705 Paxton Street, 3711 Paxton Street, and 411 S. 40th Street. **P. Ex. 40; N.T. 312-317.** However, none of the buildings were right next to one another. There were fields, roads and parking lots separating them. **Id.**

28. The total number of employees affected by the June 27, 1999 reduction in force at the "Friendship Road Campus" locations was 390, including those reduced from the 449 Eisenhower Boulevard facility. **P. Ex. 34.**

29. The Record is silent as to the total number of employees located within the "Friendship Road Campus" immediately prior to the June 27, 1999 reduction in force.

30. There was no evidence presented at trial that groups of employees rotated between the buildings at the "Friendship Road Campus" to use the same equipment or facilities as other employees stationed at those locations.

31. Employees can bid on job openings located at various buildings or be transferred as part of a re-organization. Only recent college graduates in the Rotational Engineering Program would go from one manufacturing site to another for a period of approximately four months and then move on. This involved 100-200 people at any given point in time. There was no equipment sharing. **N.T. 332-33.**

32. Mr. Cain testified that, occasionally, staff employees reported to different AMP locations in the greater Harrisburg area. Mr. Cain also testified that this was more common among top level employees who reported directly to officer level employees at AMP Headquarters. **N.T. 335.**

33. Harris Booker, AMP's Vice President for Human Resource Policy and Compliance, testified that, as to people and geography, TYCO treated the Harrisburg area as subject to the Worker Adjustment Retraining and Notification Act. **N.T. at 134.**

34. This treatment occurred because TYCO wanted to treat all employees in the Harrisburg area with fairness and dignity so that no person was deprived of notice pay while other coworkers received it. **Id. at 137.**

35. Brian Cain corroborated that all employees were treated the same in the Harrisburg area for WARN purposes as a matter of fairness and equity. **Id. at 253.**

36. In fact, Mr. Cain knew that a number of facilities did not qualify for WARN treatment. By way of example, Mr. Cain testified that 441 Friendship Road, at which the human resource function was located did not qualify. **Id. at 254.**

37. Mr. Booker also testified that, in August of 1998, Allied Signal Corporation began to make overtures to AMP for a negotiated merger transaction between the two companies. As a result of discussions between the two companies, AMP viewed the Allied Signal proposal as not in the best interests of AMP. **Id. at 140.**

38. Mr. Booker testified that, in light of Allied Signal's discussions, AMP reviewed its severance plans. AMP retained Towers Perrin, a consulting firm which provides advice on compensation and benefits issues, to recommend a structure for AMP's severance plans as a response to the Allied Signal discussions. **Id. at 140-41.**

39. Mr. Booker testified that, in August 1998, Towers Perrin provided AMP a recommended structure for a severance plan which would be triggered if there were a change in control. **Id. 142-43.**

40. Mr. Booker testified that, on August 20, 1998, he recommended the Towers Perrin structure to the Compensation Committee of AMP's Board of Directors. Mr. Booker further testified he provided the Compensation Committee a specific proposal for a severance plan based on the Towers Perrin model, but with information more specific to AMP's workforce. **D. Ex. 16; N.T. at 144.**

41. Mr. Booker testified without contradiction that, under his proposal, there were to be four classes of Company employees eligible to participate in the plan; each class was designated by Tier -- Tier I, Tier II, Tier III, and Tier IV. Mr. Booker's recommended proposal designated: Tier I would be comprised of approximately 50 divisional officers and critical management designated corporate staff directors; Tier II would be comprised of approximately 350 director level and manager level executives who participated in the AMP Stock Option Plan; Tier III would be comprised of approximately 1000 employees (other than members of Tier I and Tier II) who were in the Company's salary band M; and Tier IV would be comprised of all other exempt employees, numbering approximately 4300. **D. Ex. 16; N.T. at 145.**

42. Mr. Booker testified that the plan established within Tier I a group of "management designated corporate staff directors." **D. Ex. 16.** Mr. Booker also testified that the term "management designated" referred to management's decision to designate specific critical directors as members of Tier I. Mr. Booker explained that

these were directors that AMP determined were critical in resisting a hostile takeover. **N.T. at 142-144, 146.**

43. Mr. Booker testified that the "management designated corporate staff directors" were Doug Wilburn, Jackie Heisse and Richard Skaare. Mr. Booker explained these individuals were chosen because of their high-profile positions during a takeover fight – director of communications (media relations); assistant comptroller (financial information for shareholders); and director of investor relations (business industry media relations). **N.T. at 146-148.**

44. Mr. Booker testified that AMP's Compensation Committee approved the new severance plan as recommended; it also was adopted by the Board. **D. Ex. 16; N.T. at 153**

45. Mr. Booker identified the 1998 Plan, or "change in control" plan, titled "The AMP Incorporated Employee Severance Plan," as the plan that sought to implement the severance plan adopted by the Compensation Committee and the Board in 1998. **N.T. at 153; P. Ex. 15.** Mr. Booker testified that Schedules A and B, which the Plan references as a list of Tier I and II participants, were never physically attached to the plan because they easily were created as purely a ministerial task accomplished by printing the relevant portions of an existing computer database. **N.T. at 172.**

46. Moreover, lists equivalent to Schedules A and B were generated at the direction of Mr. Booker when Plaintiff's counsel requested them in or about August 1999. **N.T. at 155-158; D. Ex. 18.**

47. Walter Sokalsky testified that, at the request of Mr. Booker, he created two lists of employees representing those included within the definitions of Tier I and Tier II as adopted by the Compensation Committee. **N.T. at 241-246; D. Ex. 18.**

48. Mr. Booker testified the list created went back to 1998 and that there was no intent to mislead or deceive by the way the list was printed. **N.T. at 167-168.**

49. The lists attached to the August 25, 1999 letter contain information equivalent to the information that would have been contained in Schedules A and B. **P. Ex. 18, D. Ex. 18.**

50. Mr. Booker testified that no Tier I participant received a benefit under the terms of the 1998 Plan because each Tier I participant received a personal severance agreement, just as Mr. Booker received. **N.T. at 138, 168.**

51. Mark Smith testified he provided the lists Mr. Booker provided to him to Plaintiff on August 25, 1999. This is confirmed by the fax time line on the August 25, 1999 letter and attachments. **D. Ex. 18; P. Ex. 18; N.T. at 194-95.**

52. On March 30, 1999, in anticipation of the pending change in control, AMP sent all managers and directors an e-mail notifying them of the existence of the 1998 Plan. **P. Ex. 6.** This document reported the definitions of the first three Tiers as adopted by the Board of Directors in August 1998, as well as notifying employees that a release would be utilized for the severance package. **P. Ex. 6, D. Ex. 16.**

53. This document also outlined the severance entitlement of Tiers I-III under the 1998 Plan. **P. Ex. 6.**

54. Brian Cain testified that, on April 2, 1999, the change of control took place, which triggered the application of the 1998 Plan. **P. Ex. 15; N.T. 270.**

55. Plaintiff testified that, on May 3, 1999, TYCO presented him with a severance letter dated April 28, 1999. **N.T. at 87; P. Ex. 2.** This letter specifically offered benefits under the AMP Incorporated Employee Severance Plan, or the 1998 Plan. **P. Exs. 2, 15.** The letter did not reference any other severance plan by name.

56. Mr. Cain and Mr. Booker testified that Plaintiff never was offered a benefit under the 1991 Plan, nor was any AMP employee in association with the April 1999 reduction in force. **N.T. at 162, 280.**

57. Mr. Cain testified to the chronological history regarding severance leading up to the April 1999 reduction in force. As he recounted, AMP Incorporated had the 1991 AMP Incorporated Severance Pay Plan that delivered one week of severance for each full year of service. That plan did not require a release. Then, Allied Signal began a hostile takeover which triggered the creation of the 1998 Plan. However, that plan also did not require a release. **N.T. at 280-281.**

58. Thereafter, TYCO entered the scene in 1999, but it required that AMP Incorporated utilize individualized releases for the planned reduction in force. That prompted AMP Incorporated to create the March 1, 1999 Amendment to the 1991 Plan to allow for obtaining a release in exchange for an enhanced severance of one additional week with minimums and maximums as noted. **P. Ex. 7; N.T. at 281-282.**

59. However, AMP Incorporated ran out of time to implement a reduction in force before the April 2, 1999 change in control. The benefit levels of the 1998 Plan equaled or exceeded the benefits listed in the 1991 Plan amendments.

Therefore, the 1991 Plan with its amendments never was used because TYCO could not use the "enhanced severance" under the 1991 Plan as consideration for a release from employees, given that TYCO already would be paying the same level of benefits from the 1998 Plan without a release. **N.T. at 282-283.**

60. Consequently, additional consideration from some other source needed to be offered for TYCO to obtain releases from employees impacted by the April 1999 reduction in force. **N.T. at 284.**

61. Brian Cain explained that TYCO then provided additional severance outside of any plan or payment for health insurance premiums as the "enhanced severance" to support a release for state and federal claims and constitute additional consideration therefor. **N.T. at 329-330; P. Ex. 33.**

62. In the April 28, 1999 notification letter Plaintiff received on May 3, 1999, the severance amount listed was incorrect under the terms of the AMP Incorporated Employee Severance Plan because it offered him four (4) months of severance. **P. Exs. 2 and 15; N.T. at 299.**

63. Brian Cain explained that, under the 1998 Plan, there was no way to receive exactly four (4) months of severance due to the way the formula worked as number of weeks times years of service. **N.T. at 299.**

64. On or about May 14, 1999, TYCO sent Plaintiff a revised severance letter, which again only referenced the 1998 Plan. This letter identified Plaintiff's entitlement to two months of severance or $19355. The letter also identified an enhanced severance amount equal to two months' pay or $19355 in consideration for signing a release of all claims. **P. Ex. 4.**

65. Mr. Booker testified TYCO sought to provide six (6) months of salary continuation for management level employees who were not already receiving that minimum amount. This salary continuation was divided into three components for Plaintiff as a Tier III participant: the employee's severance entitlement under the 1998 Plan (2 months), the enhanced severance in exchange for the release (2 months), and notice period for employment separation (60 days). **N.T. at 159-160, 166-167.**

66. Mr. Cain testified the May 14, 1999 letter replaced the severance offer letter dated April 28, 1999, as the April 28th letter was sent with incorrect information. Mr. Cain testified that the error resulted from the logistical difficulties associated with the reduction in force. **N.T. at 272-73, 275-76; P. Exs. 2, 6, and 15.**

67. On May 10, 1999, Mr. Cain sent releases to employees, including Plaintiff. **N.T. 277-78; P. Ex. 3.**

68. Plaintiff testified that, after May 14, 1999, but before June 23, 1999, he received a release from TYCO. **N.T. at 92-93.** This release recommended that Plaintiff seek the advice of counsel before execution. **P. Ex. 5, D. Ex. 21.** Plaintiff testified that he retained counsel based, in part, on this recommendation. **N.T. at 93-94.**

69. On July 23, 1999, Plaintiff's counsel sent TYCO a letter acknowledging that Plaintiff received the May 14, 1999 severance offer. **P. Ex. 8.**

70. Plaintiff's counsel, in the August 9, 1999 letter, admitted that, "[o]f course, it is understood that an executed release is required in order to obtain the enhanced severance . . ." **P. Ex. 16.**

71. Plaintiff testified that he is familiar with releases. **N.T. at 86.**

72. Plaintiff testified that he never signed the release. **N.T. at 33.**

73. Tier III of the 1998 Plan was comprised of exempt employees in Salary Band M. **P. Ex. 6; D. Ex. 16.**

74. Salary Band M were all managers and directors at AMP Incorporated who previously were in salary bands 60 and 70. Notification of this banding was sent out to all of AMP management on January 19, 1998. **D. Ex. 25; N.T. at 267-68.**

75. Plaintiff was in salary band 70; therefore, he was in Salary Band M. **P. Ex. 27; N.T. at 268-69.**

76. Plaintiff was a Tier III employee under the 1998 Plan. He was not a Tier I or Tier II employee. **P. Ex. 6; N.T. at 274.**

77. Mr. Sokalsky testified that, throughout Plaintiff's employment with AMP, it maintained a stock option program, referred to as the AMP Stock Option Plan, under which AMP granted stock options to select employees. Mr. Sokalsky testified that Plaintiff never was a participant in the AMP Stock Option Plan. **D. Ex. 18; N.T. 247.**

78. Plaintiff testified he participated in a Management Incentive Program ("MIP"), which was converted to a cash only program by no later than 1997. **N.T. at 78-80.**

79. Plaintiff did not contradict the testimony proffered by TYCO that he never received stock options. **N.T. at 85-86.**

80. Mr. Booker testified that Plaintiff was an employee in Salary Band M, who was not one of the named critical management designated corporate staff directors, and who was not a participant in the AMP Stock Option Plan. Although the

Management Incentive Plan had an earlier option to take a bonus in stock, the stock option plan at AMP was far different. Mr. Booker testified that Plaintiff was a Tier III participant under the 1998 Plan. **N.T. at 150-152, 158-59.**

81. Mr. Cain corroborated Mr. Booker's assessment. **N.T. at 274-75.**

82. Plaintiff testified that he fit within the definition of Tier III. **N.T. at 86.**

83. On June 24, 1999, Plaintiff received his severance check in the amount of $19,355 less applicable payroll deductions, as described in the May 14, 1999 letter. **N.T. at 94; P. Ex. 4, 9.** This amount represented his severance entitlement under the 1998 Plan. **P. Ex. 4, 15.**

84. On July 2, 1999, Plaintiff's counsel identified a dispute regarding disclosure of information under ERISA. **P. Ex. 11.**

85. On July 20, 1999, TYCO provided Plaintiff with all the 1998 Plan documents in existence at the time of his request. While schedules A and B were not attached to the plan document, Plaintiff testified he received documents purporting to provide the same information described in these schedules in a fax from Mark Smith on August 25, 1999. **N.T. at 101; P. Ex. 18, D. Ex. 18.**

86. On August 9, 1999, Plaintiff's counsel sent a letter to TYCO outlining disputes Plaintiff had with TYCO regarding the amount of severance he should receive; the amount of vacation pay to which he was entitled, and WARN pay to which he felt entitled. **P. Ex. 16.**

87. On August 25, 1999, Mark Smith wrote Plaintiff's counsel explaining TYCO viewed Plaintiff as a Tier III participant in the 1998 Plan entitled to

severance equal to only two months salary. Mr. Smith disputed that TYCO owed Plaintiff any additional severance under the 1998 Plan. Finally, Mr. Smith reaffirmed TYCO's requirement that Plaintiff execute a release in order to receive enhanced severance. **P. Ex. 18.**

88. The August 25, 1999 letter also reaffirmed the offer of six months salary continuation in three distinct parts: Plaintiff's severance entitlement (2 months as a Tier III participant), the enhanced severance amount in exchange for an executed release, and 60 days of WARN notice pay. The letter also provided that, if Plaintiff was entitled to additional WARN notice pay, "this additional WARN Act payment will further reduce the enhanced severance amount to properly reflect AMP's commitment to provide a minimum of six months of salary continuation." **P. Ex. 18.**

89. On September 3, 1999, Plaintiff's counsel wrote a letter to TYCO to reiterate a dispute as to the amount of severance owed Plaintiff under the 1998 Plan; took issue with the Exhibits A and B forwarded to her by Mr. Smith on August 25, 1999; demanded additional information as to Mr. Smith's position regarding additional severance which TYCO might pay; reiterated a dispute Plaintiff had with TYCO regarding the type of disclosure it made under ERISA; and reiterated a dispute he had with TYCO as to the amount of vacation pay he received. **P. Ex. 19.**

90. Mr. Smith testified that, on September 30, 1999, TYCO erroneously paid Plaintiff the enhanced severance amount. **N.T. at 197-98.**

91. Mr. Cain testified that the payment resulted from a clerical error which mistakenly reported that Plaintiff returned a signed release. Once the clerical error occurred, Plaintiff was issued a check without the error being noticed. **N.T. at 287-88.**

92. On October 6, 1999, Plaintiff's counsel inquired as to the source of the September 30 check. **P. Ex. 21.** Mark Smith testified that he conducted an investigation and determined that the check was issued as a result of a clerical error. Mr. Smith testified that he communicated this information to Plaintiff's counsel in a telephone conversation. **N.T. at 197-98.**

93. Plaintiff was aware of TYCO's position that the September 30, 1999 check was offered in exchange for a release of claims, and that he received the second check for the release. **N.T. at 107.**

94. TYCO demanded the return of these funds its first Answer, Affirmative Defenses, and Counter Claims filed on February 22, 2000, less than five months after the erroneous payment and some 27 months before the trial of this matter. This document clearly provided that "TYCO hereby demands that Plaintiff immediately return such payment to which he has no legal entitlement."

95. Plaintiff testified that never returned the funds erroneously paid to him on September 30, 1999. **N.T. at 106.**

96. The Section 5.2 of the 1998 Plan provide for an offset of an employee's severance entitlement: If the Employer is obligated by law or by contract to pay severance pay, a termination indemnity, notice pay, or the like, or if the Employer is obligated by law to provide advance notice of separation ("Notice Period"), then any Severance Pay hereunder shall be reduced by the amount of any such severance pay, termination indemnity, notice pay or the like, as applicable, and by the amount of any compensation received during any Notice Period." **P. Ex. 15.**

97. The 1998 Plan provides for a complete offset for any other severance payment or notice pay made to a participant therein. **P. Ex. 15.**

## II. CONCLUSIONS OF LAW

1. Plaintiff accepted the September 30, 1999 severance check in the amount of $19,355, less applicable payroll deductions, tendered by TYCO in exchange for the execution of a release.

2. Under Pennsylvania law, Plaintiff's acceptance and retention of the enhanced severance, offered in exchange for a release, coupled with his knowledge of the terms and conditions of the release, operates as Plaintiff's ratification of the release and binds him to its terms and conditions. Consequently, all of Plaintiff's claims in this suit are barred by the release.

3. TYCO disputed Plaintiff's claims for vacation, WARN and severance pay, as well as his claim for damages for failure to disclose documents under ERISA.

4. TYCO offered two-months' severance to settle all of Plaintiff's claims, known and unknown, as set forth in the release.

5. Under Pennsylvania law, Plaintiff's acceptance of the enhanced severance, offered as settlement for all of his outstanding claims, operates as an accord and satisfaction of all his claims.

6. Plaintiff never was offered any benefit under the 1991 Plan.

7. "Enhanced severance" is not a term of art. TYCO never intended to offer a benefit under the 1991 Plan when it identified "enhanced severance" in Plaintiff's severance letter.

8. Plaintiff was a Tier III participant under the 1998 Plan consistent with the intent of the plan sponsor at the time of the plan's creation.

9. Plaintiff is not entitled to any benefit under the 1991 Plan.

10. TYCO properly paid Plaintiff all that to which he was entitled under the 1998 Plan.

11. TYCO did not conduct a reduction in force that involved 33 1/3% equal to at least 50 employees at any single site of employment involving Plaintiff.

12. TYCO did not conduct a reduction in force that involved at least 500 employees at any single site of employment involving Plaintiff.

13. Alternatively, Plaintiff failed to demonstrate why any locations outside of the "Friendship Road Campus" should be included as a single site of employment. The total employment loss at the "Friendship Road Campus" was 390. Consequently, Plaintiff's WARN Act claim fails.

14. Alternatively, if this Court determines that a WARN applicable event occurred, TYCO is entitled to an offset against the 1998 Plan for all sums Plaintiff received and will receive as WARN notice pay.

15. Conversely, if the Court determines that no WARN applicable event occurred, TYCO is not entitled to any offset under the terms of the 1998 Plan.

16. Pennsylvania is an at-will employment state. Terms and conditions of employment contained in a handbook are not contractual. Such disputes must be raised under Pennsylvania's Wage Payment and Collection Law. Plaintiff did not raise a wage payment and collection law claim. Consequently, Plaintiff's claim for additional vacation pay fails.

17. Plaintiff failed to establish a breach of the understanding he had with Mr. Vance as to vacation time. Consequently, Plaintiff's claim for additional vacation pay fails.

18. Alternatively, Plaintiff's contract with AMP provided only for additional vacation days while employed with "Systems Services." At the time of his separation, Plaintiff no longer worked with "Systems Services." The parol evidence rule bars any additional testimony regarding the contract, as its terms are unambiguous. Consequently, under the express terms of the contract, Plaintiff's claim for additional vacation pay fails.

19. Alternatively, if the Court finds that Plaintiff's acceptance and retention of the enhanced severance payment was not a ratification of the release or an accord and satisfaction of his disputed claims, TYCO is entitled to the return of the erroneous payment of the enhanced severance.

Respectfully submitted,

*[signature]*
VINCENT CANDIELLO
G. SCOTT PATERNO
One Commerce Square
417 Walnut Street
Harrisburg, PA  17101-1904
717 237-4014

Of Counsel:

MORGAN, LEWIS & BOCKIUS LLP

Dated:  May 24, 2002

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing TYCO Electronics Corporation's Post Trial Findings of Fact and Conclusions of Law have been served via U.S. Mail delivery, on this 24th day of May, 2002, upon the following:

> Patricia Carey Zucker, Esquire
> Michael V. Brown, Esquire
> Elliot, Reihner, Siedzikowski, Egan & Balaban
> Governors' Row
> 27 N. Front Street
> P.O. Box 1284
> Harrisburg, PA  17108-1284

*[signature]*
VINCENT CANDIELLO