*(96)*
*η.30-0*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH GORINI,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 1:CV-99-2215** |
| | : | **(Judge Kane)** |
| **AMP, INC., or its successor in** | : | |
| **interest, TYCO ELECTRONICS, INC.** | : | |
| **Defendant.** | : | |

**FILED**
HARRISBURG

JUL 2 9 2002

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

## MEMORANDUM & DECISION

This case arises out of a reduction in force during which Plaintiff was terminated from his

employment with AMP, Incorporated ("AMP"), defended here by its successor in interest,

TYCO Electronics, Incorporated ("TYCO"). By Order of May 10, 2002, this Court disposed of

the parties' cross motions for summary judgment, ruling in part for Plaintiff and in part for

Defendant. Trial to the Court on the remaining claims commenced May 13, 2002.[1] The Court

makes the following findings of fact and conclusions of law.

## I    Introduction

The amended complaint includes the following: (1) a claim for benefits under the

Employee Retirement Income Security Act of 1974 ("ERISA"); (2) a claim for Defendant's

alleged failure to provide information as required by ERISA;[2] (3) a claim under the Worker

Adjustment and Retraining Notification Act of 1988 ("WARN Act"); and (4) a claim for untaken

and unpaid vacation days.

Defendant counterclaims for repayment of (1) two months' salary it allegedly sent in

---

[1] The parties waved trial before a jury on those issue to which they were entitled to trial
by jury.

[2] Claim 2 was disposed of by this Court's May 10, 2002 ruling on the parties' cross
motions for summary judgment.

error; and (2) two months' salary it claims to have overpaid Plaintiff because his ERISA benefits should have been offset by the amount of WARN Act pay he received.

**II      Findings of Fact**

1.      AMP hired Plaintiff effective January 9, 1995, as "Manager, Data Resource Management." On January 1, 1996, Plaintiff became the Director of Global Information Architecture. Effective April 1, 1998, he held the title of Director, Special Projects.

2.      During the discussion leading to his employment with AMP, Plaintiff successfully negotiated with Mr. Ronald Vance for fifteen paid vacation days per year instead of the ten days to which AMP employees of his seniority were normally entitled. Mr. Vance, who hired and supervised Plaintiff, explicitly represented to Plaintiff Mr. Vance had the authority to negotiate vacation pay on behalf of AMP. Mr. Vance had not obtained permission from AMP Human Services before promising five extra vacation days, however, Plaintiff did not know that fact and did not know whether Mr. Vance should have sought approval from AMP Human Services before agreeing to the five extra days.

3.      Plaintiff's fifteen paid vacation days accrued throughout the year. They did not all accrue on January first of each year. He was allowed to take paid vacation days which had not accrued on the understanding that the total number of paid vacation days taken per year would not exceed fifteen.

4.      As of his separation date, Plaintiff had accrued 7.5 days of paid vacation and had used two of those days. At the time of his separation from employment, Plaintiff was paid for five unused vacation days (by check no. 1001869 dated June 25, 1999, for $1,784.77). AMP policy required paid vacation days to be taken in increments of one half and whole days only.

5.      Plaintiff received notice of his termination on May 3, 1999. The last official day of Plaintiff's employment with Defendant was June 27, 1999. He was not required to report to work after May 3, 1999.

6.      At the time of his termination, AMP maintained two ERISA severance plans:  the AMP Incorporated Severance Pay Plan, created in 1991 and amended in 1999 ("1991 Plan"), and the AMP Incorporated Employee Severance Plan ("1998 Plan"). The parties agree that Plaintiff was a participant of the 1998 Plan.

7.      The 1991 Plan did not contain a provision for a signed release when it was first created. However, in 1999, the 1991 Plan was amended to provide for additional consideration in exchange for a signed release.

2

8.      In August of 1998, in reaction to AMP's successful rejection of a takeover attempt by a company called Allied Signal, AMP decided to create a new severance plan which would be triggered by any future change in control.  The Compensation Committee and Board agreed and adopted what became the 1998 Plan.

9.      The 1998 Plan did not contain a provision for signed liability releases.

10.     The 1998 Plan did include a provision purporting to reduce severance pay under the 1998 Plan by the amount paid by AMP which it was required to pay for "notice pay, or the like, or if [AMP] is obligated by law to provide advance notice of separation."

11.     The 1998 Plan divided employees into groups labeled "Tiers."  Tier I included only fifty divisional officers and management-designated corporate staff directors; Tier II was comprised of approximately three hundred and fifty director-level and management-level executives who participated in the AMP Stock Option Plan; Tier III was comprised of all employees in AMP's Salary Band 'M' who were not in Tiers I or II (approximately 1000 employees); and Tier IV was comprised of all other exempt employees, numbering approximately 4300.

12.     Tier I was intended to provide superior benefits to only those AMP employees whose retention during a change in control would be critical.  Those employees were called "management-designated corporate staff directors" in the 1998 Plan. Plaintiff was not a management-designated corporate staff director.

13.     Plaintiff was a Salary Band 'M' employee, did not participate in the Stock Option Plan, and was not a divisional officer or critical management-designated corporate staff director.  Therefore, Plaintiff was in Tier III of the 1998 Plan.  As a Tier III participant, Plaintiff was entitled to two months' severance pay.

14.     On April 2, 1999, a change in control took place in which TYCO took over AMP. Plaintiff's termination from employment occurred in the reduction in force that followed.

15.     Defendant paid Plaintiff two months' salary on June 24, 1999, as severance pay pursuant to the 1998 Plan.  The notation on the June 24, 1999 check read "severanc" [sic].

16.     In addition to the two months' severance check of June 24, 2999, Plaintiff was offered two months' salary in exchange for signing a release.  Although the 1991 Plan, by way of the 1999 amendment, was the only severance plan maintained by the Defendant which provided for liability releases, Defendant's offer of two month's additional salary was not an offer of benefits pursuant to the 1991 Plan. It was separate, additional compensation over and above that to which he was entitled under the 1998 Plan, offered as consideration for signing a liability

3

release. Plaintiff was never offered benefits under the 1991 Plan. Defendant never intended to offer Plaintiff benefits under the 1991 Plan.

17. Plaintiff never signed the release. Due to Defendant's clerical error, a check for two months' salary, intended by Defendant as consideration for a signed release, was sent to Plaintiff on September 30, 1999. That check bore the notation "severanc" [sic]. When he received that check, Plaintiff reasonably believed it to be an additional severance payment to which he was entitled under the terms of the severance plans without singing a release. Plaintiff maintained the belief that he was entitled to those two months' of severance pay as a participant in the severance plans absent a signed release through the time of trial.

18. The Defendant caused significant confusion by its mishandling of Plaintiff's severance. The maintenance of two separate severance plans which on their faces appeared to cover Plaintiff, coupled with Defendant's failure to comply with many of ERISA's notice requirements,[3] would make a reasonable person unsure under which plan he was receiving benefits under and at what level. Moreover, one of the letters sent by Defendant to Plaintiff informed him that he was entitled to four months' severance pay without regard to a signed release, and Plaintiff believed the September 30, 1999 check to be the second check containing two months' pay. Defendant's conflicting and erroneous correspondence contributed to Plaintiff's reasonable belief that he was receiving benefits to which he was entitled without signing a release.

19. During the course of this dispute, Plaintiff became aware that it was Defendant's position that the September 30, 1999 check was sent in error. However, because Plaintiff believed that the check was for severance pay to which he was entitled, he did not return the funds.

20. At no time did Plaintiff intend to waive the right to litigate this dispute.

21. Defendant, concerned that the layoff in question might implicate the WARN Act, made an attempt to comply with the Act's notification requirements. Defendant attempted to deliver notice to Plaintiff at his work station on April 29, 1999 - exactly sixty days before his termination date. However, as was his practice, and as he was permitted to do, Plaintiff was working remotely that day and was not present at his primary work location. The Defendant could have discovered where Plaintiff was working that day by looking at his calendar or by asking staff, but did not.

22. Plaintiff received notice of his termination on May 3, 1999. The last day of

---

[3] As explained in more detail in this Court's Order of May 10, 2002, the undisputed facts evince numerous errors and deficiencies by the Defendant.

Plaintiff's employment with Defendant was June 27, 1999 and he received WARN Act pay until that date, for a total of fifty-five (55) days' pay.

23. At the time of his termination, Plaintiff's primary work location was at Defendant's 449 Eisenhower Boulevard facility, although he had worked out of several of the Defendant's Harrisburg buildings.

24. At the 449 Eisenhower Boulevard facility alone, eighty-six full time employees were terminated in the reduction in force. That number did not equal at least 33% of the full time employees at 449 Eisenhower Boulevard.

25. AMP's facility at 449 Eisenhower was one of a group of geographically very proximate buildings from which AMP operated and from which full time employees were discharged during this reduction in force: 411 S. 40th Street; 3705 Paxton Street; 3711 Paxton Street; 441 Friendship Road; 470 Friendship Road; 471 AMPWick Drive; and 101 S. 38th Street (collectively, the "site").

26. The total number of full time employees terminated from the site during the reduction in force was five hundred and sixteen (516). There is insufficient evidence to establish the proportion of full time employees this figure represents.

27. These physically separate but geographically proximate buildings shared mail services, technical services and equipment, printing services, accounting, human resources, upper management and some cross-assigned employees.

28. In addition to the facilities listed above, AMP discharged hundreds more employees from other buildings in Harrisburg, as well as facilities in Middletown, Camp Hill and Mechanicsburg, during the reduction in force. The total number of full time AMP employees discharged in the Greater Harrisburg area numbered over two thousand.

## III   Discussion

Defendant asserts that all of Plaintiff's claims are barred by his acceptance and retention of the September 30, 1999 check for two months' pay. Defendant sent the check in the erroneous belief that Plaintiff had signed and returned a liability release. Plaintiff never signed the liability release and reasonably believed that the September 30, 1999 check was severance pay to which he was due under the ERISA plans. Because the Plaintiff cashed that check and has retained the money, Defendant argues, he is bound by the terms of the release. Certainly, it is true that

retention of consideration in exchange for a release may operate as ratification of the release, and

may also operate as accord and satisfaction of claims, even where the release has not been

signed.  Walker v. Harbison, 128 A. 732 (Pa. 1925); Wojciechowski v. Spreckels Sugar Refining

Co., 35 A. 596 (Pa. 1896); Hess v. Evans, 431 A.2d 347 (Pa. Super 1981); Thompson v. D.C.

America, Inc., 951 F.Supp. 192 (M.D.Al. 1996); Sea-Land Service, Inc., v. Sellan, 64 F.Supp. 2d

1255 (S.D. Fla. 1999); Law v. Mackie, 95 A.2d 656, 660 (Pa. 1953).

Plaintiff, quite reasonably under the circumstances, believed the check to be severance

pay to which he was entitled under the ERISA severance plans and as promised in one of the

letters sent by Defendant upon his termination.  In fact, the notation on the check, "severanc"

[sic], the same notation as the June 24, 1999 check for severance pay to which Plaintiff was

entitled, only confirmed Plaintiff's belief.  Moreover, Defendant in sending the September 30,

1999, check had not intended it as an offer which Plaintiff could accept by retaining the funds

and singing the release, but as consideration for an agreement the Plaintiff refused to enter into.

And when Plaintiff received it, he did not understand it to be consideration for releasing

Defendant from liability.  The September 30, 1999 check was not a "clear and unequivocal"

payment.  It is patently clear that Plaintiff's acceptance and retention of the September 30, 1999

check did not serve as ratification of the release.  Nor did it serve as accord and satisfaction of his

claims.  Kripp v. Kripp, 784 A.2d 158 (Pa. Super. 2001).

Defendant asserts that Plaintiff should have returned the money when, during the

development of the dispute, he became aware of the Defendant's position that the money was in

consideration for the signed release.  However, there were multiple disputed debts between

Plaintiff and Defendant.  Plaintiff's retention of the September 30, 1999 check in satisfaction, he

believed, of one debt did not constitute ratification of the release or accord and satisfaction of all

6

his other claims.  It has been Plaintiff's position from the beginning that the check in question was for severance pay he was owed under the ERISA plans disputed in this action.  His position is not unreasonable given the incorrect, inconsistent and deficient information given by the Defendants.  The fact that he later became aware of the Defendant's position with respect to that check changes nothing.  Plaintiff maintained the belief that the check was for severance pay to which he was entitled - the fact that the Defendant held a different belief proves only that there was no meeting of the mind with respect to the terms of the release.  Plaintiff's retention of the funds merely means that Plaintiff was in possession of the disputed ERISA funds during the pendency of this suit, instead of the Defendant who would normally hold the disputed funds.  These facts fall far short of ratification of the release and of accord and satisfaction of his claims.  Therefore, Plaintiff is not barred from bringing his claims.

   **(a)**    **ERISA Denial of Benefits**

   A civil action may be brought "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C.A. § 1132(a)(1)(B).  As explained in the May 10, 2002 Order, the denial of ERISA benefits in this case is reviewed de novo.  Gritzer v. CBS, Inc., 275 F.3d 291, 295 (3d Cir. 2002).

   Under the terms of the 1991 Plan, Plaintiff is only eligible to receive its benefits if Defendant were to offer benefits to Plaintiff under that Plan.  At no time did Defendant make such an offer.  Therefore, Plaintiff was not eligible to receive benefits under the 1991 Plan.  Moreover, the parties agree that Plaintiff was a participant of the 1998 Plan, and the terms of that Plan disallow participation in both Plans.

   Defendant's offer of additional benefits in consideration for a signed liability release was

not an offer of benefits under the 1991 Plan.  It was an offer to enter into an agreement to waive

Plaintiff's rights to sue in exchange for two months' pay – an agreement on top of and separate

from the benefits Plaintiff was receiving under the 1998 Plan.  Considering the confused, missing

and contradictory information provided by the Defendants, his mistaken belief was quite

reasonable.  Defendant's errors -- from creating incomplete Plan documents to telling Plaintiff

that he was entitled to more benefits than he was actually due -- caused much of Plaintiff's

confusion.  However, Plaintiff is due no benefits under the 1991 Plan.

As to the level of benefits he was due under the 1998 Plan, Plaintiff argued that, because

he was "Director, Special Projects," as designated by management, he qualified as a Tier I

participant.  While superficially a coherent argument, and a reasonable position in light of the

Defendant's failure to list Tier I participants as the Plan required, Plaintiff's interpretation is

inconsistent with the intent of the Plan as proven at trial.[4]  The evidence at trial showed that the

intent of the Plan was to limit Tier I membership to a very small, select group of people whose

continued employment during the volatile time of a change in command (the trigger for the Plan)

was essential.  Plaintiff was not among those individuals.  The facts also showed that he was not

a participant in the Stock Option Plan and was in Salary Band 'M.'  Therefore, Plaintiff was in

Tier III, and was eligible to receive two months' salary as severance benefits.  The June 24, 1999

check satisfied the Plan's obligation to Plaintiff under the 1998 Plan.

**(b)     WARN Act**

The WARN Act requires employers to give written notice to each affected employee at

least sixty days before a mass layoff.  29 U.S.C. § 2102.  An employer who fails to provide

_____

[4]  See May 10, 2002 Order.

8

proper notice is liable to each affected employee for back pay and benefits for each day of the

violation.  29 U.S.C. § 2104.  In order to prevail on his WARN Act claim, Plaintiff must prove

that (1) a WARN Act event occurred; (2) he was affected by the mass layoff; and (3) he received

less than sixty days' notice.  29 U.S.C. § 2101, et seq.

Plaintiff argues that Defendant's admitted attempt to provide WARN Act notice to the

employees affected by the TYCO takeover in late April of 1999 disposes of the first issue.

Plaintiff has offered no support for the contention that attempts at compliance serve as waiver of

the right to assert that a WARN Act event did not take place.  Defendant did not concede the

issue of whether a WARN Act event occurred.  The Plaintiff herein is held to his burden to prove

that a WARN Act event took place.  See Johnson v. TeleSpectrum Worldwide, Inc., 61 F. Supp.

2d 116 (D Del. 2001).

The WARN Act defines "mass layoff" as a reduction in force which:

(A) is not the result of a plant closing; and
(B) results in an employment loss at the single site of employment during any
30-day period for--
    (i)     (I) at least 33 percent of the employees (excluding any part-time
             employees); and
             (II) at least 50 employees (excluding any part-time employees); or
    (ii)    at least 500 employees (excluding any part-time employees).

29 U.S.C. § 2101(a)(3).

The term "single site of employment" is not defined by the WARN statute.  However, the

Department of Labor provides us with the following guide:

(1) A single site of employment can refer to either a single location or a group of
contiguous locations. Groups of structures which form a campus or industrial
park, or separate facilities across the street from one another, may be considered a
single site of employment.
. . .
(3) Separate buildings or areas which are not directly connected or in immediate
proximity may be considered a single site of employment if they are in reasonable

9

geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.

(4) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of a town and which are managed by a single employer are separate sites if they employ different workers.

(5) Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate workforces are considered separate single sites of employment.

. . .

(8) The term 'single site of employment' may also apply to truly unusual organizational situations where the above criteria do not reasonably apply. The application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable.

20 C.F.R. § 639.3(i).

When he was terminated, Plaintiff worked out of Defendant's facility at 449 Eisenhower Boulevard. Eighty-six employees at that facility were terminated in the same event as Plaintiff. For this Court to find that 449 Eisenhower Boulevard experienced a mass layoff, Plaintiff would have had to prove that there were fewer than two hundred and fifty eight employees at that location before the terminations, so that the eighty-six laid off were at least 33% of that facility's full time workforce. 29 U.S.C. § 2101(a)(3)(B)(i). In his testimony, Brian Cain admitted that there may have been as few as two hundred and sixty employees at the 449 Eisenhower Boulevard facility. Testimony that there were as few as two hundred and sixty employees is insufficient to establish that there were fewer than two hundred and fifty eight employees at the time of Plaintiff's layoff. Therefore, Plaintiff has failed to meet his burden of proving that a WARN Act event took place at 449 Eisenhower Boulevard.

Pursuant to Department of Labor regulations and the Congressional intent of the WARN Act, however, the Plaintiff may look beyond the confines of the individual building in which he

worked to establish applicability of the WARN Act. 20 C.F.R. § 639.3(i); 29 U.S.C. § 2101. "A single site of employment can refer to either a single location or a group of contiguous locations. Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, may be considered a single site of employment." 20 C.F.R. § 639.3(i)(1). In deciding whether separate buildings may be considered together as a single site of employment for WARN Act purposes, the Court looks to their geographic proximity, common use, and whether they shared staff and equipment. Id. In this case, the buildings listed in ¶ 25 of the findings of fact, above, were geographically proximate. There was no evidence that each location produced different products, rather, the evidence showed that each building housed a different organ of the unified corporate structure: one building housed upper management; another housed human resources; etc. Further, they shared mail services, technical services and equipment, printing services, accounting, human resources, upper management and some cross-assigned employees. Therefore, these buildings were a "single site" of employment for WARN Act purposes. More than five hundred employees (excluding part-time employees) were discharged from that site during the mass layoff in question. Consequently, a WARN Act event occurred. 29 U.S.C. § 2101(a)(3)(B)(ii). Plaintiff worked at that WARN Act site and was affected by the mass layoff. Therefore, his discharge was covered by the WARN Act.

The next issue to consider is whether Plaintiff received sixty days' notice of his termination. He received notice on May 3, 1999,[5] but was paid WARN Act pay through June 27,

---

[5] Defendant has in the past asserted that they made a good faith effort to notify Plaintiff sixty days before his termination. While Defendant appears to have abandoned that argument, it merits brief treatment here. The evidence showed that the Defendant tried to serve every single affected employee on one day -- April 29, 1999. However, over five hundred employees were terminated from the single site identified here, and by some accounts the number of AMP employees terminated in the entire Harrisburg, Pennsylvania area was well over two thousand.

1999 for a total of fifty-five days.  He was due WARN Act payment for sixty days, or through July 2, 1999.  Plaintiff therefore prevails on this claim and is due five days' WARN Act pay.  29 U.S.C. § 2104(a)(1)(A).

In it's second counterclaim, Defendant seeks to recover the ERISA benefits paid to Plaintiff under the 1998 Plan by the amount of money it paid him as WARN Act notice pay. However, such recovery is clearly impermissible and contrary to the purpose of the WARN Act. 29 U.S.C. § 2104(a)(2)(A) lists the items for which an employer's WARN Act liability may be reduced:

> (2) The amount for which an employer is liable under paragraph (1) shall be reduced by--
>> (A) any wages paid by the employer to the employee for the period of the violation;
>> (B) any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation; and
>> (C) any payment by the employer to a third party or trustee (such as premiums for health benefits or payments to a defined contribution pension plan) on behalf of and attributable to the employee for the period of the violation.

29 U.S.C. § 2104(a) (emphasis added).  The ERISA benefits owed to Plaintiff by AMP do not fall into any of these categories.  Reducing WARN Act obligations by the amount paid under an ERISA severance plan is not permitted because AMP is under legal obligation to pay them.  See Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 151-152 (3d Cir. 1998); Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152

---

By sheer numbers, it was unreasonable for Defendant to believe it could give notice to every single affected employee on a single day.  Moreover, Defendant may not sustain a good faith defense where it could have discovered where Plaintiff was working that day and properly served him.  The only reason this did not occur, the evidence showed, was that Defendant's self-imposed time limit of one day to notify thousands of affected employees didn't allow time to find Plaintiff and give him proper notice.

(9th Cir. 2001) (holding that, where severance payment was obligatory, the defendant was not entitled to any deduction from its WARN Act liability under § 2104(a)(2)(B)); Castro v. Chicago Hous. Auth., No. 99 C 6910, 2001 WL 709445 (N.D. Ill. June 25, 2001). Defendant's position, that ERISA payments may be offset by WARN Act payments, cannot be squared with this settled rule. In light of the purposes of the WARN Act and ERISA, Defendant shall not be allowed to reduce its ERISA liability by the amount of WARN Act pay.

(c)   **Vacation Pay**

The dispute over vacation pay is as straightforward as it is minor. It turns on two questions: whether Mr. Vance's promise of five additional vacation days per year was binding on AMP; and whether all of Plaintiff's yearly allotment of vacation days accrued on the first day of a calendar year or gradually throughout the year.

As the facts found at trial make clear, AMP is bound by Mr. Vance's promises to Plaintiff. Mr. Vance was the supervisor who interviewed Plaintiff for employment, negotiated the other terms of this employment, and supervised Plaintiff once hired. Mr. Vance represented to Plaintiff that he, Mr. Vance, had the authority to bind AMP to their agreement regarding vacation days. The Defendant's insistence that the agreement for five extra days was a sort of gentlemen's agreement binding only the Systems Services Division of AMP is unavailing. Mr. Vance had the apparent authority to bind the Defendant and bind them he did.

Plaintiff's claim that all fifteen of his yearly vacation days accrued on January first of each year fails on the facts established at trial. Plaintiff accrued vacation time on a gradual basis as he worked. The fact that his supervisors allowed him to take vacation time before it had accrued does not prove that the vacation accrued in January. Plaintiff accrued 7.5 days of paid vacation by the time he separated from AMP. He had used two of those days and was paid for

five more.  Therefore, Plaintiff is entitled to recover vacation pay for one half-day.

**IV**     **Conclusion**

Plaintiff received all the ERISA severance plan benefits due to him in the June 24, 1999

check.  The September 30, 1999 check was an erroneous overpayment and Plaintiff must return

the $19,355.  Defendant owes to Plaintiff an amount equal to five days' pay ($1,784.77) for the

WARN Act violation, and one half day's pay ($178.48) for the accrued and unused vacation.

**V**      **Order**

**AND NOW**, this _29<sup>ob</sup>_ of _July_ , 2002, for the reasons explained above,

1.      The Court decides as follows:

  (a)      The Court finds in favor of Defendant and against Plaintiff on Count 1 of
           Plaintiff's Amended Complaint.

  (b)      The Court finds in favor of Plaintiff and against Defendant on Count 3 of
           Plaintiff's Amended Complaint in the amount of $1,784.77.

  (c)      The Court finds in favor of Plaintiff and against Defendant on Count 4 of
           Plaintiff's Amended Complaint in the amount of $178.48.

  (d)      The Court finds in favor of Defendant and against Plaintiff on Defendant's
           Counterclaim 1 in the amount of $19,355.

  (e)      The Court finds in favor of Plaintiff and against Defendant on Defendant's
           Counterclaim 2.

2.      Defendant's motion for an extension of time to file requests for findings of fact
        and conclusions of law (Doc. No. 72) is **DISMISSED AS MOOT.**

3.      The Clerk of Court shall enter judgment and close the file.

                                     Yvette Kane
                                     United States District Judge